E-FILED
Tuesday, 08 September, 2026 01:38:38 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **LISA COMRIE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**OSF HEALTHCARE SYSTEM,**<br><br>**Defendant.** | **Case No. 23-CV-1032** |

## ORDER

Plaintiff Lisa Comrie filed a six-count Complaint (#1) against Defendant OSF Healthcare System ("OSF") on January 31, 2023, alleging she was fired in March 2022 for opposing and complaining to management about OSF policies and practices that jeopardized OSF patients' health, safety, and legal rights. Plaintiff asserts claims against OSF for violations of the Illinois Whistleblower Act and the Illinois Hospital Report Card Act, Illinois common law retaliatory discharge, retaliation under the False Claims Act, and sex discrimination in violation of Title VII and the Illinois Human Rights Act.

Before the court is OSF's Motion for Summary Judgment (#65), to which Plaintiff filed a Response (#67). OSF filed a Reply (#75), and Plaintiff filed a Sur-Reply (#77). For the following reasons, OSF's Motion for Summary Judgment is GRANTED as to Counts IV, V, and VI of the Complaint, and the court relinquishes supplemental jurisdiction over the remaining state law claims.

## BACKGROUND

The following background facts are taken from OSF's Undisputed Material Facts, Plaintiff's Statement of Additional Material Facts, and the exhibits attached to the parties' filings. The court will only consider those facts properly before it.

As indicated, the court resolves the Motion on only three counts: False Claims Act ("FCA") retaliation, 31 U.S.C. § 3729 et seq., (Count IV), and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-102(A), (Counts V and VI). The parties have collectively asserted approximately 550 facts in their briefs, many of which are disputed. But a large majority of those facts, and the parties' disputes regarding those facts, are not directly material to the disposition of the FCA retaliation and sex discrimination claims. They are, however, still useful in evaluating the evidence as a whole and understanding the factual context of this case and Plaintiff's claims. Therefore, the court provides an abbreviated background as it relates to those facts and factual disputes ultimately irrelevant to the disposition of the Motion. *See Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (noting that irrelevant or unnecessary factual disputes do not preclude summary judgment (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). The court has endeavored to combine and organize the parties' asserted facts in the most logical order.

The Parties and Key Individuals

OSF is an integrated health care system based in Peoria, Illinois, and as of July 1, 2022, had more than 24,000 Mission Partners across more than 147 worksites, including 15 hospitals and two nursing colleges. At OSF, a "Mission Partner" is an employee.

Plaintiff is a registered nurse with over 30 years of healthcare experience. Plaintiff began working for OSF in February 2018. She was hired as a Risk Manager, and her direct supervisor was Becky Robinson.

Becky Robinson was the Director of Innovation and Clinical Risk Management for OSF at all relevant times. During 2020 through 2022, Robinson oversaw the Risk Management department. During the relevant time, Robinson reported to Jamie Carrigan.

Jamie Carrigan was the Senior Vice President of Quality and Safety and Risk Management. At all relevant times, Carrigan oversaw both Risk Management and Quality and Safety at all OSF facilities. Carrigan reports to Dr. Ralph Velazquez.

Dr. Ralph Velazquez is the Chief Medical Officer ("CMO") of OSF Ministry Services. At all relevant times, Velazquez oversaw a broad scope of services supporting clinical care delivery within OSF, and the Quality and Safety and Risk Management divisions report up to him.

Dr. Gary Hagens was the CMO at OSF Sacred Heart Medical Center ("SHMC") from January 2021 to April 2022.

Misti Tompkins was the Director of Employee Relations overseeing medical centers in Danville, Illinois, and Urbana, Illinois, from 2019 to 2023.

Ned Hill was the President of SHMC during the relevant time, which he testified was the "top position" at his facility. He testified that "President" and "CEO" were different titles for the same job duties and used offhand interchangeably in the industry. He testified that the main job duties of a CEO or president of a facility are: to "ensure the organization meets expectations in operations," to have "a balanced score card," "patient satisfaction, safety, staff satisfaction, quality, finance, regulatory compliance," and the responsibility for "ensuring the operations are as expected." Hill does not have a clinical background. He was hired by and reported to Chad Boore, OSF's Eastern Region CEO during the relevant time period. Hill does not report to Robinson.

Job Duties of Risk Managers

As a regional Risk Manager, Plaintiff oversaw risk functions and liability claims for two of OSF's hospital facilities, SHMC in Danville, Illinois, and Heart of Mary Medical Center ("HMMC") in Urbana, Illinois. From 2018 until March 2022, Plaintiff served as the sole Risk Manager for OSF's Eastern Region, covering SHMC and HMMC.

A primary responsibility of a Risk Manager is to identify, analyze, and support the mitigation of potential risks at OSF facilities and clinics. A Risk Manager is also tasked with identifying and reporting concerns related to patient safety or the adequacy of processes at OSF, and assisting in the investigations of events that cause patient harm. All Risk Managers, as part of their role, bring forth concerns or issues they identify at their facilities. One core principle at OSF is that Risk Managers should speak up if they see something unsafe, as doing so can save lives.

Risk Managers do not provide direct care to patients in a clinical setting. During her tenure at OSF, Plaintiff never directly provided nursing care to patients in a clinical setting. A Risk Manager is not required to hold any sort of medical licensure, including a nursing license. Plaintiff has not done bedside nursing for a "very, very long time[,]" and never offered to help with taking nursing shifts during the COVID-19 pandemic when there was a shortage of nurses.

It is part of a Risk Manager's job to communicate with physicians and providers and maintain confidentiality of those communications. Risk Managers have a duty to protect Protected Health Information ("PHI") under the Health Insurance Portability and Accountability Act ("HIPAA").

Risk Managers also communicated with the Legal department regarding discovery issues related to ongoing OSF litigation cases. Carrigan testified it was part of a Risk Manager's job to consult Legal, and doing so was not unusual. Plaintiff regularly interacted with the OSF legal team regarding compliance matters.

At all relevant times, the Senior Vice President of Legal Services at OSF was Robert Brandfass. At all relevant times, Patty Naylor and Rhonda Patten were litigation attorneys for OSF.

Naylor communicated a request from Brandfass to Robinson that Risk Managers seek advice on how to handle non-litigation related situations through Robinson first before contacting OSF litigation in-house legal counsel as to not inundate in-house counsel with risk management questions; however, if Robinson could not answer a question, she would refer the Risk Manager to a litigation attorney.

There was no rule at OSF that restricted Risk Managers from speaking with the Legal department without first talking to Robinson. Jackson testified that it was common practice for Risk Managers to bring questions directly to in-house counsel without going through Robinson, and she was never told not to do so.

Robinson testified that she spoke directly with Plaintiff and instructed Plaintiff to seek advice from her (Robinson) before going to Legal regarding non-litigation related issues, but she did not remember when those conversations took place. Plaintiff disputes that, stating in her declaration that Robinson never instructed her or the Risk Management team to route non-litigation questions through Robinson first.

Carrigan testified that soon after Plaintiff started at OSF, Naylor complained about Plaintiff going directly to legal without first consulting Robinson. It was Carrigan's understanding that this was an ongoing issue with Plaintiff and that Robinson had coached Plaintiff on the issue.[1]

If Robinson was not available for questions, Risk Managers' next point of contact was Carrigan. In her declaration, Plaintiff states she was never told that in Robinson's absence, her next point of contact should be Carrigan. If a Risk Manager had a time-sensitive legal question and Robinson was unavailable, Carrigan expected the Risk Manager to reach out to her (Carrigan) for advice. Robinson never specifically told Risk Managers that if she was out of the office, they should not contact the Legal department directly.

[1] Plaintiff agrees that this was Carrigan's testimony, but disputes that it was an ongoing issue on which Robinson had coached her, arguing that Robinson never told Plaintiff to seek advice from Robinson first before going to legal.

Whistleblower Protections

Velazquez testified that OSF expects employees to speak up when they have concerns about patient safety or care, and if they have concerns that laws are not being followed at their facilities. He testified that OSF has a policy that prohibits retaliation against employees who raise those types of concerns.[2]

OSF's Whistleblower Protection Policy is "designed to ensure that no OSF HealthCare Mission Partner may be punished, penalized, threatened, intimidated, discriminated against, or retaliated against for:

a. Disclosing any unlawful activity, policy or practice of an OSF operating unit, including unlawful discrimination or harassment;

b. Initiating, cooperating or participating in an investigation or proceeding concerning alleged unlawful activities, or violations of policies or practices of an OSF operating unit;

c. Objecting to or refusing to participate in any unlawful activity, policy or practice of an OSF operating unit;

d. Contacting or filing a report with law enforcement against a patient or individual due to workplace violence, in accordance with the Health Care Violence Protection Act;

e. Reporting or addressing any:

    i. Activity, policy or practice that the Mission Partner reasonably believes poses a risk to the health, safety or welfare of a patient, coworker or the public;

    ii. Allegation of unsafe, dangerous or potentially dangerous care within an OSF operating unit;

    iii. Incidents of potential fraud or abuse, or questionable practices;

---

[2] Plaintiff "disputes that this was the actual practice or policy of OSF that was followed[,]" citing a number of her facts in support.

iv. Concern about the safety or quality of care in any hospital operating unit to The Joint Commission (TJC), Public Health, or other accrediting or governing body.

f. Exercising rights protected under the Occupational Safety and Health Act and any act enforced by the Occupational Safety and Health Administration."

Integrity Line Reports

An integrity line report is an avenue for both internal Mission Partners and external patients and visitors to report instances they believe should be investigated. An individual can make an integrity report through the phone or online, and they may remain anonymous. If Mission Partners are concerned that OSF is violating the law, they can make an integrity line report, and the compliance department is responsible for investigating it and speaking to leaders of the relevant departments and divisions.

Plaintiff's Performance Generally

From the years 2018 through 2021, OSF rated Plaintiff at a 3.2 (solid), 3.3 (solid), 3.67 (solid+), and 3.333 (solid), respectively. OSF defined "solid" as "performance that consistently fulfills expectations." OSF defined "solid+" as: "Work performance regularly exceeds expectations. Demonstrates very high-level performance in all areas of responsibility. Mission Partner excels or stands out when compared to others in a like position."[3]

[3] In her Response, Plaintiff produced a chart illustrating her performance reviews by year with key comments. Key comments from 2018 were: "supports the OSF Mission, Values, and Vision everyday in her role. She is compassionate and kind when speaking with patients and Mission Partners" and "a pleasure to work with[.]" Key comments from 2019 were: "[D]oing a great job and has shown marked improvement[,]" "passionate about her role and is always available to support not

Plaintiff's last performance review as a Risk Manager was in November 2021, during which she received a rating from management of "3.33, solid."

In her deposition, Robinson was asked if she had "ever had a risk manager who complained as much as [Plaintiff] did about her concerns," to which she responded, "[e]very day. That's part of their role as a risk manager. We deal with all the bad things that happen within the organization."

Kathy Weber, a Risk Manager during the relevant time period, testified she never heard anyone express a concern that Plaintiff asked too many questions, as "that is part of our job, to ask questions." However, she testified that it "bother[ed] her to some degree, that [Plaintiff] kept bringing things up" in meetings that had already been addressed. She also recalled a time during a meeting, which she believed took place before the COVID-19 pandemic, where Plaintiff re-raised an issue and Robinson had stated "that that had already been discussed and that we were to move on."

Carrigan never heard anyone express that Plaintiff asked too many questions. Carrigan did have concerns that Plaintiff had poor judgment. For instance, Plaintiff would disregard advice from Robinson on how to handle a situation, and it became difficult to have faith and trust in her judgment.

---

only patients and their families during difficult times but she also supports her fellow Mission Partners during difficult times." Key comments from 2020 were: "She does not hesitate to follow up with patients when thy [sic] have experienced unexpected outcomes[,]" and ". . . always identifying ways to make improvements across the system." Key comments from 2021 were: "Open to feedback and listens contently," ". . . actively involved with medical staff committee to help reduce risk and promote delivery of quality care[,]" and "[l]ook forward to another great year."

Robinson perceived Plaintiff as a hard worker who cared about patients. However, Robinson felt Plaintiff's communication and interpersonal relationship building skills needed improvement. Robinson testified that there was a period of time in which Plaintiff would do the opposite of what Robinson told her to do.

OSF leaders described Plaintiff as competent, knowledgeable, and a strong patient advocate. For example, Hill testified he had a "great working relationship" with her, found her competent, and believed she had integrity. Hagens described Plaintiff as articulate, clinically knowledgeable, and persistent in raising patient-safety concerns.

October 23, 2021, Incident

On October 23, 2021, Brenda Pryor, the SHMC House Supervisor, contacted Plaintiff between 4:00 pm to 6:30 pm and explained that a patient that died in the ICU could not fit through the morgue door because of her size, and Pryor was "desperate for help" in dealing with the situation. Pryor had already spoken with her supervisor, who suggested that they contact Plaintiff to assist. Pryor asked Plaintiff for her suggestion on how to handle the situation. Ultimately, Plaintiff assisted in moving the body.

Plaintiff followed protocol by calling Hill, the administrator on call that evening, and asked for his assistance in moving the body. Plaintiff and Hill created a plan to move the body. Plaintiff would call around to local funeral homes in hopes of finding one that had a large enough morgue door to accommodate the body. Plaintiff did so, after hours, and found one with a morgue that could accommodate

the patient, but the funeral home did not have adequate manpower to transport the patient to the morgue due to the patient's size.

Plaintiff told Hill they needed extra help to move the body and asked if Hill knew anyone he could call. Hill was new to the area and the organization at the time, but he suggested he would bring his two sons, who were approximately 17 and 14 years old at the time.

While at the hospital, various people helped physically move the body to the loading dock, and the body was loaded into the waiting mortuary van. Hill, his sons, and Plaintiff accompanied the van to the mortuary. Once at the mortuary, Plaintiff, Hill, his two sons, and a mortuary worker unloaded the body into the freezer of the mortuary on a gurney with wheels. When they were moving the body into the mortuary, the gurney tipped, and the entire body fell to the floor.[4]

They attempted to lift the body but were unable to physically do so. The body became partially uncovered when it fell to the ground, allowing Hill's sons to see the patient's face. Since they could not physically lift the body, they decided to leave the body on the floor, and Hill, his sons, and Plaintiff left the mortuary. It never occurred to Plaintiff that this was a bad plan.

Plaintiff did not contact Robinson or Carrigan about the incident that evening. She did not contact any medical providers for advice on how to handle the situation. She did not contact the deceased patient's family before moving the body, although

[4] Plaintiff concedes that this is an undisputed material fact, but then asserts as an additional material fact, citing her declaration, that the body did not fall to the floor but was instead lowered to the floor while strapped in place. Hill testified that the entire body fell to the floor. Whether the body actually fell to the floor is immaterial.

she testified that Pryor was communicating with the family. Robinson stated that Plaintiff should have contacted her for advice on how to handle the situation.

The incident was alluded to at the SHMC morning huddle, a daily morning meeting. Robinson was not at this morning huddle.

Following the incident, OSF staff, including Hill, praised Plaintiff for resolving the emergency. On October 24, 2021, an email was sent out to the entire administrative and management team connected with SHMC, thanking Plaintiff and Hill for assisting with moving the patient to the mortuary.

Nothing negative about this incident was said in Plaintiff's November 2021 performance review.

Hill testified that when Plaintiff called him, he relied on Plaintiff "for determining whether what [they] were doing was appropriate and lawful[.]" Plaintiff never advised Hill to refrain from any of his actions that night. Robinson believed that Plaintiff, as a Risk Manager, should have informed Hill that bringing in his sons to move the body would result in a HIPAA violation as she received annual HIPAA training, which included what constitutes a HIPAA violation. Plaintiff states in her declaration that Hill did not, at any point, suggest that Plaintiff was overstepping or acting inappropriately.

Hagens learned about the incident and was concerned about several things related to the incident, such as HIPAA and privacy concerns, infections disease concerns, staffing concerns, COVID exposure, and whether OSF entered into a valid contract with the mortuary. Hagens felt "rather strongly" that the incident should not have occurred. Hagens reported the event to Tompkins, but he could not recall

the date he did so. At that time, Hagens' complaint was focused on his concerns against Hill. Hagens did not recall specifics concerning Plaintiff's involvement.

On January 21, 2022, Tompkins received an email with an integrity line report that noted the morning huddle in which "risk recognized Ned [Hill] for coming in with his boys to move a dead body in the morgue. [redacted]. [S]eems like this is bending the rules." The report did not mention Plaintiff. Neither Tompkins nor Robinson knew who made the report.

The parties dispute when Robinson first learned about Plaintiff's involvement in the incident. OSF asserts that Robinson believes she first learned about it through the January 2022 integrity line report. Plaintiff asserts that she discussed the incident with Robinson a day or two after it happened, and Robinson told her to share it with the Risk Management team at the next team meeting as a positive learning event for the team. Jackson testified (and Plaintiff states via her declaration) that the incident was discussed at a Risk Management team virtual meeting in the fall of 2021, at which Robinson was present, and the team agreed with how Plaintiff handled the situation.

After receiving multiple reports concerning Hill, Tompkins and her leader, Shelley Parn, decided to investigate all the events discussed in the January 2022 integrity line report. Robinson was involved in the investigation, along with Tompkins, concerning the October 2021 incident because risk was named in the integrity line report.

Tompkins and Robinson interviewed between 10 to 14 people as part of their investigation, including Hill and Hagens. Hill provided the details of the event in his interview.

Tompkins and Robinson conducted a fact-finding interview with Plaintiff on February 7, 2022, concerning the integrity line report. The investigation centered around Hill's behavior concerning the incidents in the integrity line reports. They also discussed the October 2021 incident during the meeting. Robinson testified that Plaintiff truthfully told her that she (Plaintiff) participated in the incident. But, Robinson did not know whether Plaintiff was being honest during the interview because Plaintiff said she did not remember much from the incident and did not provide much information. Plaintiff shared all the details she could recall. Neither Tompkins nor Robinson raised the prospect of disciplining Plaintiff. Tompkins had no further contact with Plaintiff between February 7, 2022, and her termination on March 21, 2022.

Robinson states in her declaration that it is not part of a Risk Manager's job responsibilities to get involved with physically moving deceased patients or directly contacting funeral homes to make arrangements for disposition of deceased remains. Robinson did testify that it was part of a Risk Manager's duties in general to "get involved in any type of event that has caused harm to a patient."

Robinson felt there were many issues with how the body was handled, including: not appropriately lifting the patient's body, non-OSF employees who were minors being brought in to move the body, and not properly notifying the family of the patient's removal to a funeral home not chosen or approved by the family.

Carrigan believed that the situation illustrated how Plaintiff exhibited poor judgment, explaining "there was nothing about that that was good judgment." Carrigan recalled telling Velazquez about this event because it was a "big deal." Carrigan inaccurately believed that Hill or Plaintiff transported the body in their own personal vehicle.

Hill testified that Plaintiff did nothing wrong regarding this incident and was looking out for the best interest of the patient.

<u>HIPAA Violation Investigation of the October 2021 Incident</u>

OSF Mission Partners receive mandatory online HIPAA training upon hire and annually. OSF maintains a HIPAA Breach of Protected Health Information Policy to comply with HIPAA. The Policy provides an objective, four-factor breach analysis that OSF's compliance team utilizes to determine whether a reportable breach has occurred.

It is not a violation of OSF's HIPAA policies for OSF employees to discuss confidential patient information with each other in the context of performing their work duties. A discussion between OSF employees involving confidential patient information could only constitute a HIPAA breach if there was PHI disclosed. A Mission Partner can be immediately terminated for HIPAA violations.

A deceased person's PHI is protected for 50 years after death. A person's face is not necessarily considered PHI. Nor is a person's medical condition, absent other ways to identify the individual.

OSF's local compliance officer evaluated the October 2021 incident using the four-factor HIPAA breach analysis and determined the incident was a HIPAA violation and a reportable breach because of the involvement of unauthorized individuals, who were children and non-OSF employees, and PHI was disclosed, including the patient's full face, diagnosis, demographic information, and physical characteristics. Plaintiff admits that this reflects the compliance officer's determination, but "disputes the underlying facts," as Hill testified his sons never entered the ICU room and thus did not see the whiteboard in the patient's room, any computer screens with patient information on it, and the patient did not have a wristband or arm identification band on. Hill disagreed that the incident constituted a HIPAA breach for those same reasons. Boore also disagreed that the incident was a HIPAA breach.

OSF's Privacy and Data Protection Officer was not directly involved in the investigation and did not independently verify the underlying information, but she reviewed the compliance officer's Breach Analysis and confirmed that the incident was a reportable breach. OSF reported this breach to the patient's legal representative pursuant to its Policy.

Robinson testified that Plaintiff's HIPAA violation was one of the most serious ones that she had ever seen at OSF from one of her Risk Managers.

Robinson and Carrigan discussed whether Plaintiff should be disciplined for the incident. They knew she was an active participant in the incident and they agreed that Plaintiff needed discipline. Carrigan testified that she believed Plaintiff should not have gotten involved because it was not the role of a Risk Manager.

Hill testified that there was discussion about whether he would go on a performance improvement plan at some point based in part on the incident. Hill had a conversation with Boore regarding Hill's rationale for not entering into a performance improvement plan. Boore said he would talk with the ministry leaders, and then the performance improvement plan "was changed to kind of a reeducation plan versus a disciplinary performance improvement plan[;]" Hill "needed to become reeducated and refamiliarized with OSF polices, practice and procedures, not necessarily the state law or HIPAA-related things, but more of how OSF likes their employees, in general, including executives, to behave and perform in situations that are like the ones that were discussed." Hill testified that the reeducation plan was ongoing until he left OSF.

<u>OSF Cares Incident Involving an Infant Death</u>

In February 2022, Plaintiff was investigating a fetal demise incident and an allegation made by the family regarding the physician involved. Plaintiff called Robinson to inform her of the incident. Plaintiff was instructed to gather facts and interview Mission Partners involved in the incident. As a Risk Manager, Plaintiff was expected to investigate the event to determine what transpired, while working together with Quality and Safety to determine whether OSF needed to adjust or adapt internal processes.

Robinson, Layne Steffen (OSF Cares Patient Liaison), and Plaintiff discussed and were working toward the case becoming an OSF Cares case. OSF Cares is a program utilized at OSF to establish a formal process with guidelines for communication and appropriate resolution in the case of unanticipated care outcomes in order to meet the clinical, emotional, and other needs of patients and family members. If a case is assigned to OSF Cares, Robinson instructs Risk Managers to direct the patient and/or patient's family to communicate with the OSF Cares Patient Liaison.

Plaintiff was told Steffen would be the OSF Cares point of contact for the family and to redirect family members' questions to Steffen. The instructions to redirect the family to Steffen were given to a group.

At all relevant times, Steffen was under the Risk Management department but was not a Risk Manager. As the OSF Cares Patient Liaison, he had a different role and responsibility than Risk Managers. He worked directly with patients and families involved in OSF Cares cases. He received special training on how to deal with grief. Steffen did not oversee any particular OSF facility or clinic. Instead, he supported all OSF facilities and clinics when an OSF Cares case arose. Robinson was Steffen's direct supervisor. Plaintiff testified that Steffen had a different role than a Risk Manager, but that he was "involved in everything else that risk managers [were] involved with[.]" Steffen followed the same guidelines as Risk Managers, attended their meetings and functions, worked the same hours, and received the same benefits.

Hill met with the parents of the deceased infant and an older woman in the patient's room and discussed autopsy options and assured them OSF would investigate. A couple of days later, he and Plaintiff met with an elderly family member to have forms signed for an autopsy. Hill testified that the interaction lasted about five to eight minutes, and the entire purpose was to have forms signed.

Hagens' office was in that space and he overheard the discussion. Hagens informed Robinson that Plaintiff and Hill met with the grandmother in Hill's office instead of referring the grandmother to Steffen. Robinson was asked in her deposition what Plaintiff did wrong in that instance, and Robinson responded: "After she was told that all contacts would go to Layne Steffen, she and Ned [Hill] met with the grandmother in Ned's office instead of referring her to Layne, and then she was dishonest whenever she was asked about if she met with anybody from the family. She said no."

After the incident, Plaintiff saw and spoke with the physician directly involved in the incident in a hallway at OSF. Plaintiff testified that she asked the physician to set up a time to meet and discuss the situation, and the physician proceeded to start discussing the incident with Plaintiff.

The physician went to Hagens' office upset about the conversation with Plaintiff. The discussion happened in an open hallway, so he was concerned about the implications of that on liability and peer review activities. He believed the conversation was inappropriate. Hagens was also concerned about this conversation due to privacy, confidentiality, peer review, and liability-related issues.

Robinson testified that Hagens called and told her about the incident in the hallway, relaying that the physician was upset. Hagens did not tell Robinson whether the family's name had been used during the conversation and Robinson was unaware whether PHI had been disclosed.

Robinson discussed the hallway conversation incident with Plaintiff, and she admitted to having the conversation. Prior to Plaintiff's termination, Robinson never met with Plaintiff to discuss her allegation that Plaintiff had improperly met with the family.

At some point, Plaintiff went to the morgue to examine the infant's body and take photographs. The parties disagree whether Plaintiff did this with authorization.[5] Plaintiff took photographs to document the condition to preserve as potential evidence, which she believed was important in this situation.

After taking the photographs, Plaintiff reached out to Robinson to ask if she should upload the photographs to the patient's electronic medical record. Plaintiff called Robinson but she did not answer, so Plaintiff called Patten in the Legal department. Plaintiff heard back from Robinson first, then Patten.

When Robinson called her back, Plaintiff reported what she observed in the morgue and Robinson told her not to upload the photographs. Plaintiff spoke with Patten because she wanted to get a second opinion and legal advice, because she was concerned about properly preserving evidence for potential future litigation. Patten

[5] OSF states that Plaintiff did this without authorization. Plaintiff disputes that, stating in her declaration that Hill and Steffen directed her to confirm or deny an allegation made by the family, and they agreed that Plaintiff should go to the morgue to investigate and observe the remains.

initially said it would not be a bad idea to upload the photograph, but then told her not to. Plaintiff did not upload the photograph.

Plaintiff asked Patten not to tell Robinson that Plaintiff had contacted Patten for advice. Robinson learned that Plaintiff reached out to Patten posing the same question and that she asked Patten not to tell Robinson about the call. Robinson accused Plaintiff of insubordination for contacting Patten. Robinson believed Plaintiff knew she was not supposed to reach out to legal after receiving advice from Robinson since she told Patten not to tell Robinson that she had called for advice. Robinson asked Plaintiff if she made the phone call to Patten, and Plaintiff answered that she did. Robinson told Plaintiff not to repeat this behavior.

After the infant death incident, during a one-on-one meeting with Plaintiff, Robinson advised Plaintiff: "I do not respond well to my mission partners working around me and not trusting my recommendation." Robinson was concerned that she gave instructions to Plaintiff, and Plaintiff did not follow the advice, but instead tried to obtain a different response from the Legal department. Robinson expected that if Plaintiff did not agree with a recommendation she (Robinson) provided, Plaintiff would have a discussion with her as to why.

Cataract Surgical Event

In March 2022, there was a surgical error in which two cataract patients received each other's intraocular lens prescriptions. The entity that employed the surgeons who performed the surgery at SHMC was not controlled or owned by OSF.

Plaintiff and Hill developed a plan to meet on March 16, 2022, with the outside entity. On March 15, 2022, Plaintiff reached out to Patten concerning the situation. Plaintiff considered the matter urgent because the outside entity sought confirmation for the next morning's meeting, plus she believed the patients still had the wrong lenses 15 days later and she believed OSF had a duty to disclose the error and arrange corrective surgery. Plaintiff testified that at one point, Hill asked her to "run [it] by legal just to get a blessing of what we were doing." She further testified: "We needed a legal opinion. So I needed to go to legal anyway. I probably would have called her [Robinson] if I had thought she was available[.]" Plaintiff testified she did not contact Robinson before because Plaintiff knew Robinson was in jury duty and did not figure Robinson had her phone.

On or about March 15, 2022, Celeste Widolff, the Director of Quality and Patient Safety at all relevant times, received a phone call from Hill. Hill explained he was instructed by his leader to reach out to Quality and Safety or Risk Management because Plaintiff and Hill scheduled a meeting with the individuals involved in the surgery, but had not yet obtained ministry-wide approval of the corrective plan before the meeting. Widolff contacted Robinson to inform her of the situation, and Robinson stated, "oh no, we should not be meeting." Plaintiff spoke with Widolff the next day and questioned why Widolff called Robinson about the situation. Plaintiff did not communicate with Robinson on March 15, 2022, prior to contacting in-house counsel.

Plaintiff texted Robinson later that day around 5:30 pm asking if she was available to discuss the situation. Robinson acknowledged in a contemporaneous email to Widolff that Plaintiff tried to reach out while she (Robinson) was speaking with Hill. Later that evening, Robinson spoke with Plaintiff and Hill. Plaintiff explained her involvement and Robinson instructed her and Hill that there should be no further discussions with the outside entity outside of the Quality Meeting and directed them to cancel their meeting scheduled for March 16, 2022.

Robinson testified that she gave Plaintiff direction not to discuss the incident with the outside entity involved because OSF did not employ the physicians involved, but Robinson learned that Plaintiff called Patten to ask about contacting the office after she (Robinson) had already given her direction. Plaintiff disputes that, stating in her declaration, "I had not previously spoken with Robinson about this event as I just learned about it that morning, and she had never instructed me not to contact outside providers in connection with it."

Robinson was not pleased to learn this because it was not the first or second time Plaintiff had gone to legal after receiving advice from Robinson. On March 18, 2022, Robinson emailed Carrigan about speaking to Tompkins from Human Resources regarding Plaintiff and stated, "She reached out to legal again after my discussion with her Monday evening. I specifically discussed with her last week she is to reach out to me before reaching out to legal."

<u>Plaintiff's Termination</u>

OSF has a Positive Discipline Policy, which is synonymous with a progressive discipline policy, that has steps including Level 1, Level 2, Decision Making Leave ("DML"), and termination. A DML is equivalent to a final warning, effective for 18 months, during which the employee is ineligible for pay increases and team awards. Per the Policy, immediate termination may be warranted without prior discipline based on the severity of the conduct. An example of an incident which can result in immediate termination is an incident involving a privacy or confidentiality violation, such as a known HIPAA violation.

Prior to the incident with the OSF Cares case with the deceased infant and the cataract surgical event, Robinson had not considered termination of Plaintiff's employment because she (Robinson) thought Plaintiff's behavior could be corrected by coaching. Robinson admitted the cataract incident first put firing Plaintiff "on her radar" and that, while she had only contemplated a DML beforehand, she decided to terminate Plaintiff after the cataract issue when Plaintiff reached out to Patten.

Robinson testified that she does not directly solicit Quality and Safety employees for feedback on Risk Managers, unless someone comes to her with a concern, in which case she will follow up.

On March 9, 2022, Robinson emailed Widolff, asking: "I thought I would just follow up with you and see if things are going better with Lisa? Do you feel like she has been communicating better? Any other thoughts or feedback you have for me?" Widolff responded shortly afterwards about "[p]ossibly improved communication" with Plaintiff and related thoughts.

On March 10, 2022, Robinson emailed Tompkins and told her that, following her one-on-one meeting with Plaintiff the day prior, Robinson agreed that a "DML should probably take place first" prior to termination. Robinson acknowledged that when she spoke with Plaintiff about her concerns related to the infant death, Plaintiff had a "different perception of what had occurred." Robinson therefore thought a DML would be "cleaner."

Robinson testified that she initially had considered putting Plaintiff on a DML "until the issues continued to just keep happening" and "she continued to do things she was told not to do[.]" Robinson testified that she based her decision to terminate Plaintiff's employment on various factors, include the series of events that occurred (i.e., the October 2021 incident, the infant death incident, and the cataract surgical incident), Plaintiff's failure to follow Robinson's instructions, and confidentiality concerns.[6]

Robinson discussed whether to terminate Plaintiff's employment with Carrigan, Tompkins, and OSF in-house legal counsel. In her position in Human Resources, Tompkins worked with leaders through discussion and consultation to determine the appropriate level of discipline for Mission Partners. Leaders are not required to involve Human Resources in discipline decisions, and the leader has the final determination as to whether discipline is warranted.

[6] Plaintiff's response to this fact is: "While this was Robinson's stated reason, her actual decision was based on [Plaintiff] raising health and safety concerns and because she wanted a male to work for her[,]" citing over a dozen of Plaintiff's facts in support.

Human Resources advised Robinson that she could either put Plaintiff on a DML or terminate her based on the circumstances. Specifically, on March 18, 2022, Tompkins emailed Robinson, stating: "Have you decided what you want to do? Yes, a DML is cleaner, but I think we have plenty to show her continued pattern of behavior is justified with a termination." Tompkins testified she thought a DML would be "cleaner" because a DML gives a final warning, and she did not believe Plaintiff had any disciplines on file at that time, "but given what she had, we could support the termination if that's what she [Robinson] decided." When asked in her deposition what she was referring to as "cleaner," she responded, "I guess I should say it seems nicer."

Carrigan and Robinson discussed the appropriate discipline for Plaintiff. Carrigan was present when Tompkins reviewed Plaintiff's performance with Robinson, and it was discussed that coaching efforts to improve Plaintiff's performance were futile, and there were episodes that Plaintiff actually lied to Robinson. Ultimately, Carrigan felt Plaintiff had exercised bad judgment and agreed with the recommendation to terminate Plaintiff. Carrigan testified that if it had only been one issue, Plaintiff could have been coached, but it was "the whole gambit [sic] of it." Carrigan supported the decision to terminate Plaintiff.

Tompkins discussed Plaintiff's discipline with her leader (Parn) and reviewed Plaintiff's pattern of behavior. Parn, per OSF policy and the situation, supported Robinson in selecting either a DML or termination.

Carrigan told Milford that she believed Plaintiff had very poor judgment. Carrigan testified: ". . . It's based on her actions, the fact that she thought it was okay to put a dead body in a personal vehicle. She thinks everything needs an RCA[7] when it's not appropriate for an RCA, you can use another type of review. She thinks everything is an emergency, she does not have good judgment."

Robinson terminated Plaintiff's employment on March 21, 2022. The termination letter states in pertinent part:

> You were called on 10/24/2021 by the Administrative Supervisor at [SHMC] regarding concerns with a deceased patient. Instead of redirecting her to her nursing leader or the ICU nursing leader, you remained engaged in the situation which was outside your scope.
>
> Another example of this behavior happened recently with a highly sensitive situation also occurring at [SHMC]. You were specifically told not to have any interaction with the patient and/or the patient's family. You proceeded to meet with the patient's family anyway, instead of letting the OSF CARES Patient Liaison be the OSF contact person in this matter. In addition you were instructed not to upload pictures taken during the incident to the Electronic Medical Record and made a call to in-house legal services after speaking with your direct leader. You showed serious insubordination by engaging with in-house Legal who agreed with your leader's recommendation. Lastly you were overheard discussing details of this situation with the Physician directly involved in an open hallway violating our confidential policies.
>
> Most recently there was a 3rd situation at [SHMC] involving a cataract surgical error. I have discussed with you numerous times, including most recently on March 9, 2022 about discussing situations with myself before reaching out to in-house Legal. You again did not follow proper escalation processes and reached out to in-house Legal services on March 15, 2022 before reaching out to your direct leader.

[7] An "RCA" is a Root Cause Analysis and discussed more infra.

The role that Hill played in the October 2021 incident did not factor into Robinson's decision to terminate Plaintiff because Hill did not report to Robinson. Robinson never warned Plaintiff that her job was at risk.

Robinson believes that when investigating complaints about Risk Managers, it is important to talk with the Risk Manager and get their side of the story to ensure that the investigation is thorough. Under the Positive Discipline Policy, it is generally appropriate to interview employees and discuss accusations against them if there was some dispute about the facts that might give rise to discipline.

Per Plaintiff, Robinson and Tompkins never interviewed her about key allegations before terminating her. OSF disputes this, stating that while there was not a formal interview prior to terminating Plaintiff, Robinson had several discussions with Plaintiff about her conduct. OSF also notes that Robinson and Tompkins conducted a fact-finding interview with Plaintiff in February 2022 regarding the October 2021 incident.

Hagens testified he was "surprised" by Plaintiff's termination because she was "clinically astute" and he had no difficulties working with her. Hill was surprised to hear that Plaintiff was terminated.

Following Plaintiff's termination of employment, and after interviewing other applicants, Scott Hendren, a male, was hired to fill the role of Risk Manager. Hendren had 20 years of experience as an assistant for a medical malpractice plaintiff's attorney and extensive prior risk management experience for a large hospital organization. The leaders of the facilities recommended that Robinson hire Hendren.

Plaintiff's Internal Appeal

Plaintiff appealed her termination under OSF's Fair Treatment Policy. The Policy provides a means for employees to have their discipline reviewed and functions as an internal grievance process. The Policy allows for grievances for any discipline level, with sequential review up the chain of command.

Carrigan was assigned to conduct a portion of the review. Plaintiff submitted a written statement as part of that portion. Carrigan never met with Plaintiff, interviewed witnesses, or independently verified the facts in the termination letter or Plaintiff's statement. Carrigan upheld Plaintiff's termination.

Velazquez was assigned to conduct the next portion of the review. He did not recall ever meeting with Plaintiff to conduct the review. Plaintiff reached out multiple times regarding the status of this portion of the review, but the review was never completed.

Plaintiff Reporting to an Outside Agency

In Carrigan's deposition, she was asked: "Did you ever have concerns that [Plaintiff] would report legal violations, or health and safety concerns at OSF to an outside entity?" to which she responded, "No, I didn't." When asked if she ever heard of anyone else at OSF that had those concerns, she responded, "No, I didn't."

Plaintiff disputes that, however, citing to an email dated June 28, 2022, in which Milford states, in part, that Plaintiff was fired two months prior by Carrigan's team, and "[Plaintiff] doesn't agree with the dismissal and that is why she is trying to discuss the situation with you. According to [Carrigan], 'their team had a concern that [Plaintiff] would report the facilities to [the Illinois Department of Public Health

("IDPH")] for something or not maintain confidential for risk cases - she has very poor judgment and is disgruntled. And she isn't honest.'" When asked about that same email in her deposition, Carrigan testified: "I didn't have that concern before she started all this.[8] I wasn't, but we've had that issue in the past when people have been let go, they'll make up stuff, and she was exhibiting that type of behavior. It wasn't something I had a concern for before."

Carrigan was then asked whether she could recall having conversations with Robinson about the concern or worry that Plaintiff would report OSF to IDPH. She responded: "No, I think it was a comment, it wasn't like an ongoing conversation, it's just like, you know, like she's escalating, right. She'd be the type that, you know, would, you know, want to get revenge, and report something, and have IDPH breathing down our necks. It was that kind of conversation, it wasn't something that we were stressing about."

Tompkins never received any complaints that Plaintiff would report OSF to IDPH. Hill did not have any concerns or hear anyone else have concerns that Plaintiff would report legal violations or health and safety concerns at OSF to an outside entity. Weber never had concerns or heard anyone else express concerns that Plaintiff would report legal violations or health and safety concerns to an outside entity.

---

[8] From the context in the deposition, "before she started all this" appears to refer to Plaintiff post-termination appeal.

Carrigan testified that the concern that an employee would report OSF to IDPH was "a concern of employees that are disgruntled," it was "not uncommon," and it was not unique to Plaintiff.

December 2021 Meeting

On December 13, 2021, a Risk Manager meeting and holiday gathering was held at a Risk Manager's house. Plaintiff alleged that during this meeting, Robinson announced that more males were needed on the Risk Management team. Jackson testified Robinson had stated to the whole group, "I would like to see some more men on the team. Wouldn't you like that, Layne? Shouldn't we give Layne some company?" Robinson did not recall during her deposition whether she made the statement. At that time, one male, Steffen, and eight females reported to Robinson.

Plaintiff also alleges that on February 11, 2022, Robinson offered Steffen an extra day off because he worked outside normal business hours. Plaintiff testified that she never requested compensatory time.

Jackson testified that around February 2022, she became aware that Steffen was allowed to work from home on Fridays.

Process for the Disposition of Patient Remains

Neither SHMC nor HMMC have policies on how to handle unclaimed bodies in their morgues or policies related to how long a body can remain in their morgues. OSF morgues are not designed for long-term storage. Plaintiff repeatedly raised concerns about unclaimed bodies being stored for months in the morgues at SHMC

and HMMC, emailing Risk Managers and escalating to Robinson and Carrigan. OSF also lacked any policy on handling situations in which a body could not fit inside OSF's morgues.

Plaintiff informed Robinson that the local coroner refused to pay for cremation of abandoned bodies and suggested OSF pay for such cremations. Plaintiff solicited bids for cremation services from local funeral homes. Plaintiff attempted to arrange cremations and worked with funeral homes to address the morgue problem, and Robinson was aware of her efforts. Robinson informed Plaintiff it was not a part of a Risk Manager's role to become involved in the process of meeting with funeral homes to obtain pricing as it was a nursing operations and supply chain role, and OSF's supply chain had the proper authority to enter into contracts on behalf of OSF. Robinson instructed Plaintiff to work with nursing services on a process to handle indigent remains.[9]

At various points, Plaintiff was in contact with the Champaign and Vermilion County Coroners.[10]

---

[9] Plaintiff's additional fact no. 60 states that "Comrie complained to Robinson and in Risk Management team meetings on numerous occasions that OSF did not have a clear process in place for disposing of the bodies of indigent patients or unclaimed bodies once they were moved to the SHMC and HMMC morgues. Robinson told Comrie that it was not her responsibility and that she should not be involved." However, Plaintiff did not dispute OSF's facts that Robinson instructed Plaintiff to work with nursing services on a process to handle indigent remains, and that the nursing supervisor was responsible for the disposition of unclaimed bodies in the morgue.

[10] Plaintiff further described in her declaration things she discussed with the Coroners, including that the Coroners confirmed that under Illinois law, a hospital is financially responsible for the disposition of patient remains when the patient dies in the hospital, and that Plaintiff reported unclaimed bodies remaining in OSF's

Robinson was unaware that Plaintiff was considering reporting morgue overcapacity issues to the IDPH.

Plaintiff was asked in her deposition what evidence she has in support of her allegation that she was terminated because of her opposition to the treatment of deceased patient remains. Plaintiff responded: "Well, that's -- I feel that as a healthcare organization we have a duty to preserve the integrity of the bodies, whether they're indigent or families just don't have funding or whatever. It was horrifying to me to have to sit there and watch these bodies be in our morgue for months and months and months, up to a year, and what their decomposition process looked like. That was very bothering to me. And it just -- as any other patient safety issue would be."

Involuntarily Admitted Patients

Plaintiff and Robinson had discussions about Plaintiff's concerns about OSF holding patients involuntarily who have mental health concerns. Plaintiff testified that her concern was "the fact that we were violating the laws of the mental health code because . . . they had never filed the petitions and certificates in the court system, which is obviously a huge violation of patient rights." Plaintiff states in her declaration that she "specifically described the practice as illegal under the Illinois Mental Health Code. Robinson ignored those concerns, declined to change course, and told me to stop working on the issue."

---

morgues for prolonged periods of time. OSF argues that the relevant portion of the cited evidence should be stricken because it impermissibly adds details beyond what she testified to, and because her related interrogatory response failed to identify that she made reports to the Coroners about unclaimed bodies.

However, Risk Managers do not file any court paperwork, including paperwork related to involuntarily admitted patients. Since this was not a Risk Manager's area of expertise, Robinson instructed Plaintiff to reach out to Cheryl Crowe, OSF Ministry Behavioral Vice President, the expert in these situations, to provide additional information. Risk Managers are expected to raise these types of concerns, and in doing so, contact the OSF Mission Partner with the requisite experience, such as Crowe, who can provide the necessary education to the Mission Partners. Plaintiff could organize an education session between Crowe and the Mission Partners at her facility, which is what Robinson instructed her to do. Robinson believed Plaintiff reached out to Crowe for her expertise but does not know whether Plaintiff followed up.

In November and December 2021, Plaintiff raised concerns about the petition process at SHMC by emailing OSF leadership and bringing the issue directly to them and providing them with the citation to the Illinois Mental Health Code. Plaintiff testified that Dr. Rogers and Hill were receptive to her concerns. Plaintiff testified that Crowe and Dr. Sears were addressing the gaps within the process and were very receptive to Plaintiff discussing the process.[11]

[11] Plaintiff also asserts that she contacted the Vermilion County State's Attorney's Office to report that SHMC's emergency room was holding multiple patients involuntarily without paperwork required by Illinois law; she confirmed that necessary paperwork had not been submitted and subsequently informed Robinson, Hill, and other SHMC leaders that she contacted the State's Attorney's Office and reported the holds and confirmed that paperwork had not been filed. OSF disputes these facts, arguing that the cited evidence should be stricken because Plaintiff's related interrogatory responses failed to identify this information and it contradicts her deposition testimony.

<u>Medicare Billing</u>

Plaintiff brought up the topics of proper reporting and billing for Medicare patients to Robinson. More specifically, Plaintiff raised concerns that liability-related bill write-offs were "kind of done under the table type thing," without proper Medicare reporting, and she reported the issue directly to Robinson, noting there was no formal process for Risk Managers to be made aware of such write-offs so they could determine whether reporting to the Centers for Medicare & Medicaid Services ("CMS") was required.

According to Plaintiff, this arose on a case-by-case basis, and she would address it when a situation arose with a specific patient. Plaintiff did not identify any specific patient with which this occurred or whether the patient was Medicare eligible. Further, Risk Managers are not directly involved in billing Medicare patients or handling write-offs for Medicare-eligible patients.

Plaintiff testified in her deposition that her sole complaint related to Medicare billing is she believed OSF lacked a "good formal process" for notifying Risk Managers of write-offs to a Medicare or Medicare-eligible patient's bills, to allow Risk Managers to properly notify OSF's insurer to ensure proper reporting.[12]

[12] Plaintiff attempts to dispute this fact in her Response by stating that she "testified that her complaints about OSF's lack of formal process for notifying Risk Managers about bill write-offs related to a 'violation of government filings.'" That assertion requires clarification. In Plaintiff's deposition, counsel asked about whether Plaintiff had any additional evidence supporting her claim that she was terminated for raising Medicare billing issues. Plaintiff responded: "No. I think it's just another, you know, bringing up something else, and it was something that had been continuously brought up and, you know, when you keep addressing it and keep addressing it, people just get annoyed. But the Medicare billing probably wasn't the highest priority. I mean, it was more the patient safety stuff that was more my thing

Plaintiff based this belief on the fact that she would not be notified of a write-off prior to it being done, but then would occasionally and randomly learn that a write-off occurred. Specifically, she testified:

> Q: And so I guess from a risk management standpoint, how did you become aware of these?
>
> A: Well, that's the whole thing is I was supposed to be made aware of whenever something, a bill -- like there was a bill write-off. I was to be made aware of that so that I could submit it through to IRMS[13] so they can look. Because if we make an adjustment to a patient's bill who is a Medicare eligible or a Medicare recipient benefit patient, then we have to report that to Medicare if we make any adjustments to their bill so that then they've got the option to either say, okay, now you adjust our portion of what we've paid you or, you know, they don't have to do that. We just have to notify them to give them that option. So if we make any adjustment to a bill, and there was adjustments being made locally that they were doing write-offs on bills and notifications. I might find out through conversation or through committee meetings or things how this was written off the bill or that was written off the bill. There was not a good formal process for notification on that.
>
> . . .
>
> Q: And apart -- other than the notification process issue that you identified, were there any other complaints that you raised internally concerning Medicare billing?
>
> A: No, I don't believe so.

---

that I was -- and the deceased bodies were my things that I was really adamant about getting. But, I mean, this Medicare thing was big because it's a violation of government filings and things like that."

So, Plaintiff's testimony about a "violation of government filings" was just an explanation to counsel as to why she believed that raising her Medicare reporting and billing issues was a reason for her termination. She did not testify that a "violation of government filings" was something she raised in a complaint to OSF.

[13] Earlier in Plaintiff's deposition she indicates that IRMS refers to "Illinois Risk Management Services," OSF's insurance company. Robinson testified that IRMS is OSF's "TPA for our self-insurance program." The court presumes "TPA" means a third-party administrator.

Robinson brought forth a concern to Carrigan that Risk Management was not made aware of bill adjustments because Robinson is responsible for ensuring proper reporting. In 2020, Robinson communicated with Carrigan and Velazquez about her concerns related to Medicare billing write-offs and her concern went to the Senior Vice President who handled billing at OSF. After that discussion, local facilities were no longer able to write-off portions of patient bills.

Carrigan testified that there was a concern that there may have been write offs or bill adjustments that were happening at certain facilities that were not always reported to Risk Managers where they could then review it and see if it needed to be reported to CMS.[14]

---

[14] This fact is the first part of Plaintiff's Additional Material Fact 52. The latter part of the fact states: "Comrie was concerned that OSF may have been improperly charging Medicare for hospital-acquired conditions without reporting them." Plaintiff cites paragraph 23 of her declaration in support.

Paragraph 23 states: "Another issue that I raised with Robinson was that local facilities were writing off portions of patient bills without notifying Risk Managers and without ensuring proper Medicare reporting. In some instances, adjustments would be made to patient responsibility portions of the bills in order to mitigate the chance of a liability claim, yet not reported to [CMS], as is legally required. I raised this concern with Robinson on multiple occasions and told her that I believed the practice was unlawful and in violation of the MMSEA. I also raised this concern at Risk Management team meetings, including at a 2021 meeting during which Robinson interjected and told me that it was not an appropriate discussion for the meeting."

Paragraph 23 does not apparently have anything to do with improperly charging Medicare for hospital-acquired conditions without reporting them. The latter portion of Fact 52 is not supported by the evidence cited, and the court therefore does not consider that portion of the asserted fact.

At a Risk Management team meeting in 2021, Plaintiff raised the issue of bill write-offs and Robinson interjected and said that that was not an appropriate discussion for the meeting. Denise Jackson, a Risk Manager from a different region than Plaintiff, explained in paragraphs 9 and 10 of her declaration:

> I recall another meeting, in approximately 2021, held in-person at the Pioneer Parkway site in Peoria, IL, where [Plaintiff] raised the issue of write-offs. [Plaintiff] explained that her facility was writing off disputed bills, a practice I understand to be impermissible under Medicare. I told [Plaintiff] that this should not be happening. At that point [Robinson] interjected and said that this was not an appropriate discussion for this meeting.
>
> At another time, [Plaintiff] also raised the issue of whether her facilities were properly assigning 'fall scores' to patients and/or initiating proper protocols to mitigate patient falls, and whether this might be leading to unlawful Medicare billing practices. I remember [Robinson] saying that this is an issue the Quality and Safety . . . team should be dealing with, not Risk Management.

Jackson confirmed there was systemwide confusion about Medicare write-offs.

Robinson felt it was appropriate for Plaintiff to bring these concerns forward. Robinson testified that Plaintiff raised her concerns of bill write-offs in good faith and that Plaintiff was worried OSF was billing for things it should not have been billing for. Robinson did not believe Plaintiff understood the Medicare billing process. She told Plaintiff the billing department had a process for Medicare billing based on their contracts with the insurance carriers. She testified:

> She [Plaintiff] was told that our billing department has a process, they have contracts with certain insurance carriers, and there are certain things that they cannot bill for, which they follow. It's a billing issue; it's not something risk management gets involved in. When risk management has a write-off, which is very different from billing, we work with [IRMS]. If it's a Medicare patient or Medicare eligible patient, [IRMS] reports those for us.

Plaintiff also testified she brought her concerns to executive local leadership, including the CMOs, and there was conversation with these leaders on how to fix the issue. Plaintiff felt she received the most support from the CMOs in devising a solution and the CMOs were helpful, but Plaintiff admitted this was not a "quick overnight fix." She also raised the issue with the corporate billing department.

No one discouraged Plaintiff from investigating this issue. Plaintiff felt "people just get annoyed" because she continuously "brought up" issues, including Medicare billing. Plaintiff did not provide any evidence of a specific situation or identify a particular individual who became annoyed because she brought up concerns related to Medicare billing. Plaintiff admitted that Medicare billing was not a patient safety concern.

Plaintiff testified that she had no additional evidence, apart from her belief that people may be annoyed with her, that OSF terminated her for raising Medicare billing issues.

Patient Safety Event Investigations

OSF utilizes different tools to review patient safety events. Quality and Safety is the department responsible for compliance with hospital regulatory accreditation, infection control activities, and for reviewing safety events to determine if further action is needed. Widolff was the Director of Quality and Patient Safety at all relevant times and had accountability for HMMC and SHMC. Widolff has no leadership role over Risk Managers and was not Plaintiff's supervisor.

Quality and Safety oversees the Root Cause Analysis ("RCA") process. An RCA is a tool used to evaluate certain serious sentinel events or safety events to determine if there are gaps in processes that could risk patient health and safety if not addressed, and recommend appropriate action plans. RCAs were typically limited to the facility level and in response to a specific event. The Quality and Safety department has authority to determine whether an RCA will be conducted. Whether an RCA was warranted for a given incident was typically a collaborative decision between Quality and Safety, Risk Management, the CMO, Chief Nursing Officer, and the leaders of the unit in which the event occurred. The group would review the incident and discuss whether an RCA is appropriate, or another type of investigation is warranted. Widolff was one of the employees primarily responsible for implementing RCAs.

There were disagreements between Quality and Safety and Plaintiff over whether RCAs should be performed. Plaintiff repeatedly told Robinson that the Quality and Safety team were unwilling to implement RCAs in response to numerous events and failed to appropriately address, document, or investigate known failures in delivery of safe patient care. Robinson testified that Plaintiff constantly recommended RCAs and expressed frustration that Widolff would not conduct them. Weber confirmed that Plaintiff's push for RCAs sometimes created friction, particularly with Widolff.

Comments and Behavior by Supervisors and Leaders

Robinson testified that Plaintiff was a hard worker and cares about patients, and continued: "It's just unfortunate she didn't always work on things she should be working on in risk management and would go outside herself." She continued:

> Q. Do you think if she would have stayed in her lane, she would have had more success at OSF?
>
> A. Not only stayed in her lane, but if she would have continued to work on communication skills, if she would have continued to work on building relationships with mission partners in her regions, if she would have worked on communicating with me, and maybe if she didn't agree with something that I had recommended to her, having the discussion with me as to why, maybe pulling in my leader to have that discussion instead of constantly doing things that she was told not to do.

Plaintiff believes OSF terminated her because OSF wanted to silence her. In support of this belief, Plaintiff testified that she perceived her relationship with Robinson changed over time and felt Robinson belittled her during team meetings. Specifically, Plaintiff recalled Robinson yelled at her at a Risk Manager team meeting in Peoria and told her they were not discussing an issue she raised at the moment. Plaintiff could not recall the specific issue that she raised during this Peoria meeting. Robinson admitted she became frustrated with Plaintiff during the Peoria meeting because Plaintiff would constantly raise a concern, Robinson would provide a recommendation, and Plaintiff would not follow the recommendation. Robinson admitted to telling Plaintiff, "I need you to stop."

Other Risk Managers expressed frustration and complained to Robinson that Plaintiff was becoming disruptive during team meetings. Plaintiff disputes this fact, noting that Robinson testified that one of those individuals was Weber; however,

Weber testified she never made complaints to anyone at OSF about Plaintiff and she never complained to Robinson about Plaintiff's conduct during team meetings.

Plaintiff testified to other examples of belittling her in front of the Risk Management team, including how on calls, Robinson "always went against" her when she would mention things, and Robinson was never supporting her ideas or suggestions.

Robinson testified that she did not find it disruptive that Plaintiff brought forward health and safety concerns in general, however, Robinson found it disruptive when Plaintiff would continue bringing up issues and questions that had already been addressed. The complaints made by other Risk Managers about Plaintiff did not impact Robinson's decision to terminate Plaintiff.

Jackson stated in her declaration that at Risk Management meetings, Plaintiff would frequently ask questions and "raise concerns related to OSF policies and practices regarding patient safety, patient care, and hospital billing, among other issues. When [Plaintiff] raised these issues at team meetings, Becky [Robinson] was generally dismissive towards her. Becky often acted exasperated and would frequently raise her voice and cut [Plaintiff] off when she raised those concerns. And Becky would often exhibit disrespectful body language towards [Plaintiff] when she raised these issues, including by sighing audibly and rolling her eyes when [Plaintiff] spoke."[15]

[15] OSF's hearsay objection to this paragraph is overruled.

Widolff was asked in her deposition what Plaintiff's strengths and weaknesses were in her job. Widolff responded that her strength was her passion about her role, and "that sometimes her weakness was knowing when she should -- and this is an OSF code I am going to explain -- to stay in her lane. So OSF is big about if it's your responsibility, you know, you stay in your lane, where she would drift over to other areas or departments." She testified that sometimes Plaintiff would raise concerns with her that were not her responsibility.

In April 2021, Plaintiff emailed Widolff asking whether there was a reporting gap concerning OSF's obligation to report maternal deaths occurring within a year of birth to IDPH. Widolff responded to Plaintiff, then forwarded the exchange to an OSF compliance officer, writing in reference to Plaintiff, "OMG. . . she does not know her lane…" Widolff testified she may have forwarded that email because she was frustrated that Plaintiff was always "find[ing] fault with everything we did."

Plaintiff states in her declaration that OSF excluded her from meetings with outside regulators. When agencies came onsite, Widolff usually acted as OSF's lead contact "and repeatedly left me out, giving excuses when I asked to participate."

<u>Plaintiff's Complaint</u>

Plaintiff's Complaint asserts six counts: Illinois Whistleblower Act (Count I); Illinois common law retaliatory discharge (Count II); violations of the Illinois Hospital Report Card Act (Count III); False Claims Act Retaliation (Count IV); sex discrimination in violation of Title VII (Count V); and sex discrimination in violation of the Illinois Human Rights Act (Count VI).

**ANALYSIS**

OSF moves for summary judgment on all counts of the Complaint. Relevant to this Order, OSF argues that the FCA retaliation claim fails because Plaintiff failed to show she engaged in an activity protected by the FCA, that OSF knew she engaged in a protected activity, or that there was a causal link between any protected activity and her termination. OSF then argues that the sex discrimination claims fail because Plaintiff cannot present evidence that supports an inference of intentional discrimination, she cannot prove she was meeting OSF's legitimate expectations, there were no similarly situated individuals treated more favorably than her, and Plaintiff cannot prove OSF's actions were a pretext for discrimination.

Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court is tasked with deciding, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

However, the court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Likewise, the court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

To survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 322-23). "[T]he nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (cleaned up).

Summary judgment is neither a substitute for a trial on the merits, nor a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 918. "But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated." *Vaughn v. Radio One of Indiana, L.P.*, 151 F. Supp. 3d 877, 885 (S.D. Ind. 2015) (citing *Celotex Corp.*, 477 U.S. at 322). "In such a situation, there can be 'no genuine issue as to any

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

Count IV: False Claims Act Retaliation

The False Claims Act, 31 U.S.C. § 3729 et seq., "makes it unlawful to (1) knowingly present a 'false or fraudulent claim for payment or approval' to the United States government, or (2) knowingly make, use, or cause to be made or used a 'false record or statement material to a false or fraudulent claim.'" *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 633 (7th Cir. 2016) (quoting 31 U.S.C. § 3729(a)).

"Under 31 U.S.C. § 3730(h), an employer cannot retaliate against an individual in any matter 'because of lawful acts done by the employee in furtherance of an FCA enforcement action under this section or other efforts to stop 1 or more violations' of the FCA." *Lewis v. AbbVie Inc.*, 152 F.4th 807, 813 (7th Cir. 2025) (cleaned up). "In other words, a plaintiff must prove that he was engaged in protected conduct and was fired 'because of' that conduct." *Uhlig*, 839 F.3d at 635. "That extrapolates into three elements: (1) the employee's actions were in furtherance of a FCA action or preventing a FCA violation (protected conduct requirement); (2) the employer knew the employee engaged in protected conduct (notice requirement); and (3) the employer took a retaliatory action in response." *Lewis*, 152 F.4th at 813 (citing *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 715 (7th Cir. 2014)).

The FCA "is not an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016) (cleaned up). The FCA "does not prohibit retaliation for any kind of complaint about improper behavior made by an employee; the improper behavior must relate to claims for money from the federal government." *Trupp v. Roche Diagnostics Corp.*, 440 F. Supp. 3d 990, 997 (S.D. Ind. 2020) (citing *Boyd v. Keystone Const.*, 2015 WL 4427630, at *3 (S.D. Ind. July 20, 2015)).

OSF argues that Plaintiff cannot make a sufficient showing on all three elements. Plaintiff argues that her conduct is precisely the type of conduct that federal law is designed to protect, that OSF had actual notice of her protected activity, and that OSF's reasons for firing Plaintiff were pretextual.

*Protected Conduct*

Protected conduct includes undertaking efforts to stop FCA violations, including investigatory efforts. *Trupp*, 440 F. Supp. 3d at 996. It also includes reporting suspected misconduct to supervisors. *United States ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 664 (7th Cir. 2022). To determine whether an employee's conduct was protected, courts "look at whether '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Uhlig*, 839 F.3d at 635 (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)). The FCA does not "protect an employee who just imagines fraud without proof." *Fanslow*, 384 F.3d at 481. "[N]or does it protect an employee

who does not hold an actual belief that 'the employer is committing fraud against the government.'" *Trupp*, 440 F. Supp. 3d at 999 (quoting *Absher*, 764 F.3d at 715).

Having carefully reviewed the evidence, the court concludes that Plaintiff never held the subjective belief that OSF was committing fraud against the government.

Plaintiff was employed as a Risk Manager. She did not work in the billing department, she was not directly involved in billing Medicare patients or handling write-off for Medicare patients. There is no evidence that Plaintiff personally observed, participated in, or knew of any improper billing practices occurring. There is no evidence that Plaintiff had any information or knowledge about a specific write-off regarding a Medicare patient that resulted in a false or fraudulent claim to the government. She did not identify any specific patient for which she had concerns, or whether the patient was Medicare eligible.

Plaintiff raised the topics of proper billing and reporting for Medicare patients generally to Robinson. She raised the issue that OSF lacked a sufficient formal process for notifying Risk Managers of write-offs to Medicare or Medicare-eligible patient bills, to allow them to properly notify IRMS to ensure proper reporting to Medicare. She raised concerns that liability-related bill write-offs were being handled "under the table" without proper Medicare reporting.[16] According to Robinson, Plaintiff was worried OSF was "billing for things [OSF] should not have

---

[16] It is unclear, but it seems that charging for hospital-acquired conditions may be the root of Plaintiff's concern with "liability-related write-offs."

been billing for." And, at some unknown time, Plaintiff raised an issue regarding "fall scores" and proper protocol regarding patient falls, and whether OSF processes regarding the same might be leading to unlawful Medicare billing practices.[17]

Plaintiff was clearly worried about the lack of a formal process and the potential for improper Medicare reporting and unlawful Medicare billing. But there is simply no evidence that Plaintiff subjectively believed OSF was committing *fraud*, as opposed to maybe committing statutory and regulatory violations as an unintentional, possible consequence of occasionally failing to report write-offs to Medicare in instances where Medicare reporting was required and a Risk Manager did not otherwise find out about the write-off. Nothing suggests that Plaintiff suspected that OSF was *knowingly* fraudulently billing Medicare in any circumstance, or that OSF knew that any of its Medicare billing was false or fraudulent. A lack of sufficient process that unintentionally results in unlawful Medicare reporting or billing is not fraud. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) ("[T]hat the defendants made mistakes or were negligent . . . is insufficient to infer fraud under the FCA."); *see also U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]raud entails making a false representation . . . . Tripping up on a regulatory complexity does not entail a knowingly false representation.").

---

[17] Plaintiff presents this issue as distinct from failing to report liability-related write-offs and hospital-acquired conditions.

Additionally, Plaintiff raised her concerns with leaders multiple times, but there is no evidence that she investigated whether any of the issues she raised actually led (or could lead) to unlawful billing practices, let alone fraudulent ones. Rather, she just continued raising the issues with leaders and discussing solutions. "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Fanslow*, 384 F.3d at 481. Nothing suggests that Plaintiff was in that position.

Plaintiff argues that she was concerned that OSF may have been improperly charging Medicare for hospital-acquired conditions without reporting them, which she understood to violate Section 111 of the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(8). She then argues that CMS will not reimburse hospitals for preventable medical errors. Presumably, the argument is that at least some hospital-acquired conditions are considered preventable medical errors, so costs related to a hospital-acquired condition are not reimbursable, and billing Medicare for such a condition without disclosing that it was hospital-acquired, is fraudulent.[18]

Even crediting this concern,[19] Plaintiff likewise puts forth no evidence that Plaintiff subjectively believed that OSF was committing fraud by billing Medicare for hospital-acquired conditions without proper reporting. The only evidence Plaintiff cites is a single paragraph from her declaration stating, in part: "In some instances, adjustments would be made to patient responsibility portions of the bills in order to

---

[18] Plaintiff makes no specific argument as to patient falls and fall scores.

[19] *See* footnote 14, supra.

mitigate the chance of a liability claim, yet not reported to [CMS], as is legally required. I raised this concern with Robinson on multiple occasions and told her that I believed the practice was unlawful and in violation of the MMSEA." But Plaintiff did not work bedside with patients to observe any with hospital-acquired conditions, she did not identify any patients with which this happened and whether they were Medicare or Medicare-eligible patients, and again, she was not directly involved in billing or handling write-offs. The cited evidence supports only that Plaintiff believed this practice—in the instances it may occur and not discovered by a risk manager—was a statutory violation; any inference that Plaintiff believed OSF was committing fraud would be entirely speculative. Indeed, Plaintiff never testified she was concerned about fraud, nor does she attest to that in her declaration, nor does she argue in her Response that she had a good-faith belief that OSF was committing fraud.

In sum, Plaintiff has not presented evidence by which a reasonable jury could conclude that Plaintiff actually and reasonably believed that OSF was, or could be, committing fraud against the government when she raised her concerns with OSF. Because Plaintiff has failed to show that she engaged in protected conduct, summary judgment must be granted in favor of OSF and against Plaintiff on Count IV.

*Notice*

Even if Plaintiff had established that she engaged in a protected activity, she has failed to submit evidence by which a reasonable jury could determine that OSF had notice of her protected activity.

"The notice requirement is not particularly onerous, but it is essential. All it asks is that the employee convey to his employer that he suspects fraud." *Lewis*, 152 F.4th at 814 (citing *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1272 (10th Cir. 2023)). The employee "must make it clear that his complaints were 'aimed at preventing the [employer's] submission of false or fraudulent claims' to the government." *Id.* (quoting *Singletary v. Howard*, 939 F.3d 287, 300 (D.C. Cir. 2019)). "'[M]erely informing an employer it is not complying with a statutory, regulatory, or contractual requirement' is not sufficient." *Id.* (quoting *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146, 1160 (10th Cir. 2022)); *Czajka v. Anovion, LLC*, 2025 WL 2239339, at *5 (N.D. Ill. Aug. 6, 2025) ("The FCA does not reach any and all run-of-the-mill statements by an employee that the employer is not complying with federal requirements connected to federal funds. Voicing concerns about non-compliance isn't enough.").

The notice requirement is "especially important in light of the stringency of FCA claims." *Lewis*, 152 F.4th at 815. The FCA's "goal is to prevent actors from defrauding the government." *Id.* (citing *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 662, 672 (2008)). Again, it "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* (cleaned up) (citing *Universal Health Servs.*, 579 U.S. at 194).

OSF argues that as a Risk Manager, Plaintiff was tasked with bringing forth concerns related to OSF's practices or processes, and Robinson and hospital leaders found it appropriate for Plaintiff to bring forth concerns related to Medicare billing

write-offs. Thus, OSF argues, there is nothing in the record to suggest that Robinson or OSF received notice that Plaintiff was engaging in any protected activity under the FCA.

Plaintiff argues that OSF had actual notice because Plaintiff told Robinson that "an unlawful Medicare billing practice was occurring, citing the specific law it violated. Her raising of statutory violations would alert any reasonable employer that she was raising a legal compliance issue, not a mere internal policy gripe." Plaintiff notes that she raised the issue multiple times, with additional personnel and departments, so multiple OSF agents "knew she was in a whistleblower posture."

As described above, Plaintiff raised the topics of proper billing and reporting for Medicare patients generally, and complained of a lack of a sufficient formal process for notifying Risk Managers of write-offs. Setting aside the fact that Plaintiff testified the notice process issue was her sole complaint regarding Medicare billing, she also raised concerns that some write-offs were "'kind of done under the table type thing' without proper Medicare reporting," that procedures and protocols regarding patient falls might be leading to unlawful Medicare billing practices, and that Plaintiff "was worried that OSF was billing for things it should not have been billing for."

These complaints were not clearly aimed at preventing OSF from submitting false or fraudulent claims to the government. *See Lewis*, 152 F.4th at 814. Plaintiff certainly raised concerns that OSF was possibly noncompliant with Medicare reporting requirements in various scenarios and that OSF procedures may lead to unlawful Medicare billing practices. However, complaints about an employer's

improper behavior are not enough—"the improper behavior must relate to claims for money from the federal government." *Trupp*, 440 F. Supp. 3d at 997 (citing *Boyd*, 2015 WL 4427630, at *3); *see also Lewis*, 152 F.4th at 814 ("Merely informing an employer it is not complying with a statutory, regulatory, or contractual requirement is not sufficient."). Plaintiff notifying OSF of possible statutory and regulatory violations is decidedly inadequate to put OSF on notice that Plaintiff sought to prevent any FCA violations. *See Lewis*, 152 F.4th at 814. There is no evidence that she indicated any concern of fraud, as opposed to identifying potential risks to OSF from inadequate procedures—which was her job.

Plaintiff argues that "[c]ourts routinely find knowledge satisfied where the employee points out suspect billing[,]" citing *Mooney v. Fife*, 118 F.4th 1081 (9th Cir. 2024), *Mikhaeil v. Walgreens Inc.*, 2015 WL 778179 (E.D. Mich. Feb. 24, 2015), and *Krause v. Eihab Hum. Servs., Inc.*, 2015 WL 4645210 (E.D.N.Y. Aug. 4, 2015). The circumstances in those cases, however, are incomparable.

In *Mooney*, the plaintiff was hired as a dermatology practice's chief operating officer and was responsible for operational management and compliance. He was fired shortly after he noticed irregularities in the dermatology practice's billing practices. He put forth admissible evidence that he had extensive experience and knowledge of the rules, regulations, and proper practices of billing insurance and Medicare for medical services; he could recognize issues of fraudulent billing; and what he saw being done had reasonably appeared to him to be "across the line into illegal and fraudulent unbundling, upcoding, and improperly billing non-physician time and tasks as being the work of physicians" in electronic records. He concluded

that that information would be used to formulate and produce bills to Medicare and Medicaid. *Mooney*, 118 F.4th at 1092. The plaintiff also alleged specific instances of those improper billing practices. The Ninth Circuit noted that those specific practices were so commonly understood as fraudulent that the plaintiff was not required to explain to his employer why they violated any laws or regulations, and concluded that the plaintiff had put his employer on notice by raising issues of improper billing at weekly one-on-one meetings with his employer.

In *Mikhaeil*, the plaintiff was employed as a pharmacist at a Walgreens pharmacy and testified about a situation where an incorrectly filled prescription was not reversed, which resulted in Medicare being billed twice for the same prescription. She told her employer, "There is something with…the Medicaid or Medicare fraud, ma'am. I can see that here[,]" and provided two specific prescription numbers. *Mikhaeil*, 2015 WL 778179, at *4. The court found that the plaintiff satisfied the notice requirement since she testified she reported her concerns about "a potential instance of Medicare fraud" directly to her employer. *Id.* at *8-9.

Then, in *Krause*, a state agency notified Eihab, a not-for-profit organization, that it would be audited by a private accounting firm. The plaintiffs testified that during this audit, an employee reported to one of the plaintiffs that Eihab's executive director had asked the employee to "fraudulently recreate missing billing records that Eihab was required to give the [auditors] to support services that Eihab had billed to Medicaid." *Krause*, 2015 WL 4645210, at *1. The employee refused to do so, and the plaintiffs informed the auditors of the incident, which "therefore alerted the auditors to the risk of fraud." *Id.* at *8. The court concluded that the plaintiffs

"presented a wealth of evidence" from which a reasonable juror could find the defendants knew about the plaintiffs' meeting with the auditors and accusations of fraud, including evidence of draft minutes from a meeting of the Eihab board of directors in which the executive director "is quoted as stating that she 'should have fired . . . [one of the plaintiffs] when she reported to the State that [Eihab] [was] forging documents[.]'" *Id.*

In each of those cases, the employer had clear or explicit notice that the employee suspected fraud. The *Mooney* plaintiff directly raised issues with his employer of what appeared to him to be fraudulent unbundling, upcoding, and time classifications, which were used to formulate and produce bills to Medicare. The *Mikhaeil* plaintiff explicitly stated to her employer that she could see a Medicare fraud issue for double billing a prescription to Medicare. The *Krause* plaintiffs had evidence of a quote from the organization's executive director that she should have fired one of the plaintiffs for reporting that the organization was forging Medicare-related billing records.

A few weeks after OSF moved for summary judgment, the Seventh Circuit issued its decision in *Lewis*, in which the plaintiff appealed an order dismissing his FCA retaliation claim. 152 F.4th 807. While at the motion to dismiss stage, *Lewis* is still instructive. In that case, Jeffrey Lewis was a sales representative for AbbVie and marketed its drugs to medical providers, including the drug Vraylar. AbbVie was successfully marketing the drug Vraylar for off-label use, but Lewis refused to push Vraylar's off-label use. He was told to "hammer practitioners harder about Vraylar [for the off-label use] or else risk replacement by a 'bolder' representative." *Id.* at 812.

Lewis then complained to his direct supervisor and the Human Resources department about the off-label initiative. By the summer of 2020, he was emailing Human Resources "that he worried about being 'noncompliant' when pitching Vraylar off-label and related issues of 'corp policy.'" *Id.* He also alleged that he "raised concerns over the program's 'illegality,' but never framed his internal grievances as related to defrauding the government through the off-label campaign. Instead, he complained of regulatory risks." *Id.* As a result, Lewis allegedly lost a promotion and received excessive work.

Lewis's theory of fraud had a few interconnected premises. He contended that government insurance usually does not cover prescriptions for off-label uses and roughly 40% of Americans were insured by the government. Thus, "AbbVie caused providers to present false claims to the government because they prescribed Vraylar for an off-label use at AbbVie's insistence, to at least one government-insured patient, and submitted a claim for reimbursement." *Id.* at 814. Lewis did not name any providers that may have submitted false claims. Rather, AbbVie was the "alleged engine of malfeasance for designing and executing a deceptive off-label campaign that led third parties (the providers) to consummate the fraud." *Id.*

The Seventh Circuit stated that an FCA retaliation plaintiff "must make it clear that his complaints were aimed at preventing the employer's submission of false or fraudulent claims to the government[,]" and that "merely informing an employer it is not complying with a statutory, regulatory, or contractual requirement

is not sufficient." *Id.* (cleaned up). Thus, the court found that Lewis failed to state a claim because he "complained about being 'noncompliant' and 'corp[orate] policy' without once suggesting he feared defrauding the government." *Id.* at 815.

The court also reasoned that "the longer the chain of causation, the less related protected conduct and notice become." *Id.* It explained, "AbbVie is purportedly causing third parties to defraud the government by subscribing to a marketing pitch. The marketing scheme does not imply any of these fraud concerns on its face, so an individual complaining about it is not plausibly conveying a connection to the FCA or unlawful claims for government payment." *Id.* (cleaned up). "Instead, the 'obvious alternative explanation' that proves fatal for Lewis, is that AbbVie risked violating the FDA's regulations about off-label marketing, wholly unrelated to the FCA." *Id.* (citing *Twombly*, 550 U.S. at 567). "Nothing in Lewis's communications would steer AbbVie toward the FCA." *Id.* at 816.

The facts of *Mooney*, *Mikhaeil*, and *Krause* stand in stark contrast with *Lewis* and the instant case. At most, Plaintiff raised the risk of statutory and regulatory violations; nothing about Plaintiff's complaints indicated that she suspected fraud. To be sure, Plaintiff is not required to show that OSF did actually violate the FCA, or identify specific instances where she suspected fraud. *See United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc.*, 305 F. Supp. 3d 964, 981 (S.D. Ind. 2018) (noting that FCA retaliation plaintiffs "need not be able to prove fraud on the merits" and "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together" (citing *Fanslow*, 384 F.3d at 481)). Of

course, doing so would be an easier case. But she has not done so, and the evidence Plaintiff presents supports only that she reported the possibility of statutory and regulatory violations, not fraud, by OSF.

Plaintiff's own argument supports this conclusion. She argues that "[h]er raising of statutory violations would alert any reasonable employer that she was raising a legal compliance issue, not a mere internal policy gripe." Raising "statutory violations" or a "legal compliance issue" is exactly what the Seventh Circuit has explained is not sufficient. *See Lewis*, 152 F.4th at 814

Moreover, one of Plaintiff's primary responsibilities in her role was to identify, analyze, and support the mitigation of potential risks at OSF. Plaintiff regularly interacted with the Legal department regarding compliance issues. It was a part of her job to identify and report concerns related to the adequacy of processes at OSF. That is what she did here. Her complaints were consistent with her regular job duties[20] and nothing in or about her complaints suggested that she believed OSF had

[20] To this point, *Fanslow* discusses a "heightened notice standard" for cases involving "employees who are charged with discovering fraud in the normal course of their job duties." *Fanslow*, 384 F.3d at 483-84. When it is the employee's job to ensure legal compliance, the act of alerting supervisors to the possibility of non-compliance does not necessarily put them on notice that the employee was planning on bringing a qui tam action against them or reporting their conduct to the government. *Id.* at 484 (discussing *Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002)); *Lord v. Univ. of Miami*, 571 F. Supp. 3d 1299, 1313 (S.D. Fla. 2021) ("[T]he heightened requirement for compliance professionals derives from the statute's causation element and the 'core insight' that 'an employer is unlikely to be on notice when an employee does not raise concerns about fraud or simply does [his] job[.]'" (citing *Singletary*, 939 F.3d at 305-06 (Katsas, J., dissenting))).

There has been some uncertainty as to whether this standard is still applicable after the FCA was amended to protect employees for engaging in efforts to stop FCA violations (in addition to engaging in conduct in furtherance of an FCA action). *See,*

fraudulently sought money from the government or would have otherwise steered OSF toward the FCA. *See id.* at 813 ("Because Lewis's internal complaints to AbbVie

---

*e.g.*, *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 2023 WL 6880605, at *6 (E.D. Wis. Oct. 17, 2023) (indicating "it is not clear that a fraud-alert employee must meet a heightened notice requirement to receive protection" after the 2009 amendments to the FCA); *Swanson v. Battery Park City Auth.*, 2016 WL 3198309, at *5 (S.D.N.Y. June 8, 2016) ("[S]ome courts have observed that it is doubtful" that those heightened standards for notice survive the 2009 amendments to the FCA . . . as the decisions propounding the heightened standard were concerned with ensuring that the employer was on notice of an employee's intentions of bringing or assisting in an FCA action, while the 2009 amendments broadened the scope of the FCA's whistleblower provision to protect against retaliation in cases where the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." (cleaned up)); *but see, e.g.*, *Lord*, 571 F. Supp. 3d at 1313 ("The 2009 and 2010 amendments to [the FCA] left intact this higher hurdle for compliance workers.").

Regardless, the heightened notice requirement appears to still be the law in this circuit. *See, e.g.*, *United States ex rel Helfer v. Associated Anesthesiologists of Springfield, Ltd.*, 2014 WL 4198199, at *8 (C.D. Ill. Aug. 25, 2014) (determining the relator had no legal compliance duties and thus the heightened notice requirement was inapplicable); *United States v. Indianapolis Neurosurgical Grp., Inc.*, 2013 WL 652538, at *8 (S.D. Ind. Feb. 21, 2013) (determining the relator "would be considered a 'fraud-alert' employee subject to the heightened notice requirement outlined in *Fanslow*").

The heightened requirement would seem to apply here. One of Plaintiff's primary responsibilities was to identify, analyze, and support mitigation of potential risks at OSF. Risk Managers are also tasked with identifying and reporting concerns related to the adequacy OSF processes, and assisting in investigating events that cause patient harm. Plaintiff regularly interacted with the OSF legal team regarding compliance matters. While Plaintiff was not directly involved in billing or write-offs, it was within the scope of Plaintiff's job to report what she determined to be a possible compliance issue. Thus, Plaintiff is required to have been even *more* clear in her communications with OSF that she was concerned with fraud. Plaintiff simply reporting that she was concerned that there may be improper or even unlawful Medicare reporting and billing is not enough to put OSF on notice that Plaintiff suspected fraud. *See Fanslow*, 384 F.3d at 483-85; *Brandon*, 277 F.3d at 944-45 ("[T]rying to convince the shareholders to comply with the Medicare billing regulations . . . usually does not put an employer on notice of FCA litigation." (cleaned up)); *Lewis*, 152 F.4th at 814-15 (citing with approval *Brandon*; collecting cases).

never suggested that his concern was fraud-based, rather than rooted in regulatory violations, AbbVie was not on notice that Lewis sought to prevent any FCA violations. This deficiency is fatal to his claim.").

Accordingly, Plaintiff has not presented evidence by which a reasonable jury could conclude that OSF was on notice that Plaintiff suspected OSF was submitting false or fraudulent claims to the government.[21] Summary judgment must be granted in favor of OSF and against Plaintiff on Count IV.

Counts V and VI: Sex Discrimination

OSF argues that Plaintiff fails to establish a prima facie case of sex discrimination under Title VII and the IHRA because she was not meeting OSF's legitimate expectations, she offered no evidence that a similarly situated male employee was treated more favorably than her, and because OSF articulated a legitimate, non-pretextual reason for her termination.

Plaintiff argues that she was meeting OSF's legitimate expectations, that Steffen and Hill were proper comparators and treated more favorably than her, and circumstantial evidence support an inference of discrimination. Plaintiff also argues that this is one of the "unusual" cases where there is direct evidence of discriminatory intent, because Robinson stated that she wanted more men on her team, fired Plaintiff, and replaced her with a male.

[21] Because OSF was not on notice of any protected activity, it follows that OSF could not have terminated Plaintiff in retaliation for a protected activity. *See Lewis*, 152 F.4th at 813.

Plaintiff asserts sex discrimination claims under both Title VII and the IHRA. These claims "proceed under nearly identical standards," so the court will address them together. *Rongere v. City of Rockford*, 99 F.4th 1095, 1102 (7th Cir. 2024); *see, e.g., Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 933 (7th Cir. 2017) (addressing Title VII and IHRA sex discrimination claims together).

When a defendant moves for summary judgment on a discrimination claim, "the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (cleaned up). "Whether a plaintiff offers direct or circumstantial evidence of discrimination," the Seventh Circuit has "made clear . . . that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Id.* (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

The parties disagree as to which analytical framework is appropriate here. OSF argues for *McDonnell Douglas*[22] since Plaintiff's theory "hinges on comparator evidence," citing the Complaint. Plaintiff opts for *Ortiz* and argues that comparator evidence is not required (although, she argues, there are suitable comparators). Plaintiffs are required to plead claims, not legal theories, so Plaintiff is not bound to the *McDonnell Douglas* framework by the way her allegations are framed in the pleading. *See ACF 2006 Corp. v. Mark C. Ladendorf, Att'y at L., P.C.*, 826 F.3d 976, 981 (7th Cir. 2016). "[T]here are many tests and rubrics for viewing discrimination

[22] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

claims," and "it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025) (citing *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022)). The court will analyze the claims under both *McDonnell Douglas* and *Ortiz*.

*Burden-Shifting Framework*

Under the *McDonnell Douglas* approach, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Rongere*, 99 F.4th at 1102. To do so, "a plaintiff must show that '(1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees.'" *Id.* at 1102-03 (quoting *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005)). "If the plaintiff meets her burden, the defendant must provide a nondiscriminatory reason for the adverse action. Then, the burden shifts back to the plaintiff to prove that the proffered reasons were mere pretext." *Id.* at 1103.

**Similarly Situated Employees**

"To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was directly comparable to her in all material respects so as to eliminate other possible explanatory variables." *Mitchell*, 143 F.4th at 810 (cleaned up). "The purpose of the similarly situated inquiry is to eliminate other possible explanatory variables, to isolate the critical independent variable—discriminatory animus." *Id.* (cleaned up). Typically, the fact finder decides the question of whether a comparator is similarly situated to the plaintiff, unless

there is no evidence from which a reasonable fact finder could conclude that the plaintiff met their burden on the issue. *Igasaki*, 988 F.3d at 957.

OSF argues there are no similarly situated male colleagues who were treated more favorably than Plaintiff. It contends that Plaintiff relies on two male employees as comparators: Layne Steffen and Ned Hill. OSF first argues that Hill is not comparable due to his position as President of SHMC, because he reported to a different person than Plaintiff, and his participation with Plaintiff in the October 2021 incident is inconsequential since Robinson had no supervisory or disciplinary authority over him.

Plaintiff argues that Hill was treated more favorably because he was not disciplined beyond reeducation after the incident, even though he brought his sons along and approved the entire plan. She further argues that Hill's position as President does not automatically defeat comparability, since he was involved in the same incident as Plaintiff.

"[W]hen uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011) (collecting cases). "[A]n employer cannot 'insulate itself from claims of . . . discrimination' by making formalistic distinctions between employees." *Id.* (quoting *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999)).

Hill is not a similarly situated employee to Plaintiff. Hill was the President/CEO[23] of SHMC—the top position at the facility—and reported directly to OSF's Eastern Region CEO, Chad Boore. Plaintiff, on the other hand, was the Risk Manager for OSF's Eastern Region (covering SHMC and HMMC), which is an entirely different position with an entirely different reporting structure. She reported to Robinson, who reported to Carrigan, who reported to Velazquez. Hill did not report to Robinson, and Robinson had no disciplinary or supervisory authority over Hill. This different reporting structure matters because "[a] similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). The fact that Hill was only disciplined with reeducation for the October 2021 incident "sheds no light on the decision" by Robinson to terminate Plaintiff, in part, for the same incident. *Id.*; *Allen v. Benton*, 2022 WL 18147674, at *14 (N.D. Ill. Feb. 25, 2022).

While it is true that sometimes a supervisor can be an apt comparator, they "usually make poor comparators" because "employees of higher rank commonly have different job duties or performance standards." *Rodgers*, 657 F.3d at 517-18. Such is the case here. This is not an instance where job title and rank make a "formalistic distinction between employees." *Id.* at 518. Hill testified that as president/CEO, he had duties in a wide range of areas, including operations, patient satisfaction, safety, staff satisfaction, quality, finance, and regulatory compliance.

---

[23] Hill testified that the terms "president" and "CEO" are used interchangeably in the industry.

Hill had a completely different position, with distinct job duties, and a different direct report. He is not directly comparable to Plaintiff in all material respects and is therefore not a similarly situated employee to Plaintiff.

OSF next argues that Steffen is not comparable because although he reported to Robinson, he had a unique position within the Risk Management team, he had special training for that role, and there is no evidence he engaged in similar conduct or behavior to Plaintiff, or any questionable behavior whatsoever.

Plaintiff argues that Steffen received more favorable treatment in that he received extra time off and weekly remote-work privileges, and was similarly situated because he reported to Robinson, followed the same Risk Management guidelines, and attended the same meetings as Plaintiff.

Steffen is also not a similarly situated employee. While he is a closer comparator than Hill at first glance, the evidence still falls well short. It is true that Steffen was under the Risk Management department, reported to Robinson, and per Plaintiff, was "involved in everything else that risk managers [were] involved with[.]"[24] He also followed the same guidelines as Risk Managers, he attended Risk Management meetings and functions, worked the same hours, and received the same benefits.

Steffen, however, was not a Risk Manager. He was the OSF Cares Patient Liaison, which was a different role with different responsibilities. Steffen worked directly with patients and families involved in OSF Cares cases, which are cases

---

[24] Plaintiff does not elaborate on what this means, but agrees that Steffen was not a Risk Manager, and that he had a different role as the OSF Cares Patient Liaison.

involving unanticipated care outcomes. Steffen did not oversee any particular facility or clinic, but supported all facilities and clinics when an OSF Cares case arose. If a case was assigned to OSF Cares, Robinson would instruct Risk Managers to direct the patient and their family to communicate with the OSF Cares liaison, which goes to showing the distinction between the job duties of Steffen and a Risk Manager, like Plaintiff. Steffen also had special training for his position. There is no evidence that Steffen had any of the same responsibilities as a Risk Manager. Steffen's unique position on the Risk Management team set him apart from the Risk Managers. The fact that Steffen's role fell under the Risk Management team umbrella does not make him a similarly situated employee to Plaintiff.

But perhaps more importantly, there is no evidence that Steffen and Plaintiff engaged in any similar conduct or situations to support an inference that any differing treatment was the result of Plaintiff's sex. *See Parson v. City of Danville*, 2023 WL 12148308, at *16 (C.D. Ill. Mar. 21, 2023). Plaintiff does not argue there were any situations of uneven discipline involving Steffen, like she does with Hill. There is no evidence that Steffen engaged in any sort of conduct comparable to Plaintiff. Steffen is therefore not directly comparable to Plaintiff in all material respects, *see Mitchell*, 143 F.4th at 810, and is therefore not a similarly situated employee to her.[25]

---

[25] Plaintiff argues that Steffen received more favorable treatment in that he received extra time off and weekly remote-work privileges. Jackson testified that she became aware around February 2022 that Steffen was allowed to work from home on Fridays. However, there is no evidence Plaintiff asked for and was denied remote work privileges. It is true that Robinson offered Steffen a single extra day off because he worked outside normal business hours. Plaintiff testified that she never requested any compensatory time, but she also worked outside normal business hours and Robinson did not offer similar compensatory time to her. Regardless, Plaintiff not

In sum, there is no evidence by which a reasonable fact finder could conclude that Hill or Steffen are similarly situated to Plaintiff. Plaintiff's sex discrimination claims therefore fail under the *McDonnell Douglas* framework. *See Igasaki*, 988 F.3d at 958.

*Cumulative Assessment*

Once again, the singular question for the court is whether Plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that her sex caused her termination. *See Igasaki*, 988 F.3d at 957. Put another way, the issue is whether OSF would have fired Plaintiff if she had been a man and everything else had remained the same. *See Pratt v. Wisconsin Aluminum Foundry*, 183 F.4th 541, 551 (7th Cir. 2026) ("Put another way, the issue is whether the employer would have fired Pratt if she had been a man and everything else had remained the same."). The court must consider "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958. All the evidence "belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.

"Plaintiffs seeking to meet that burden have relied upon such circumstantial evidence as suspicious timing, ambiguous statements of animus, evidence other

being offered an extra day off is not an adverse employment action. *See Ortiz*, 834 F.3d at 765 ("The legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the *discharge or other adverse employment action*." (emphasis added)). Thus, this evidence of uneven treatment does not go to determining whether Steffen is a similarly situated employee. It is, however, part of the "single pile" of evidence to be evaluated as a whole regarding the sex discrimination claims. *See id.* at 766.

employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024).

Plaintiff cites the following evidence as support for her discrimination claims: Plaintiff's "solid" and "solid+" performance reviews (i.e., she was meeting OSF's legitimate expectations); Robinson's comment about wanting more men on the Risk Management team and the number of females versus males on the team; Hill's disparate discipline; and Steffen's more favorable treatment.

**Performance Reviews**

Plaintiff received "solid" and "solid+" scores on her performance reviews throughout her tenure at OSF. Plaintiff received many positive comments on those performance reviews, including that she was passionate, "doing a great job," "open to feedback and listen[ed] contently," and "actively involved[.]" But Plaintiff's past performance is largely irrelevant, because the issue is not her past performance, but whether she was performing well at the time she was terminated. *See Igasaki*, 988 F.3d at 595. "[P]ast positive evaluations do not guarantee future employment. Nor does such evidence, without more, show discrimination." *Id.*

Plaintiff's last review was in November 2021, during which she was rated "3.33, solid." That review came after the October 2021 incident, although the parties dispute whether Robinson knew about the incident before the integrity line complaint, and her review mentioned nothing negative about the incident. But the

two other cited reasons for Plaintiff's termination, her behavior surrounding the infant death incident and cataract surgical incident, both occurred after that performance review.

Plaintiff argues she was justified in her behavior for various reasons, but does not deny her underlying actions during those events. During the infant death incident, Plaintiff asked Patten the same question she had previously asked Robinson about uploading photos of the infant to the electronic medical record. Plaintiff asked Patten not to tell Robinson about their call. After the incident, Robinson told Plaintiff not to repeat her behavior and advised her that she (Robinson) does not respond well to Mission Partners "working around [her] and not trusting [her] recommendation." But shortly thereafter, Plaintiff contacted Patten without communicating with Robinson about meeting with the outside entity involved in the cataract surgical incident. What matters is Plaintiff's job performance through Robinson's eyes at the time of her termination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) ("The proper inquiry mandates looking at Gates' job performance through the eyes of her supervisors at the time of her suspension and termination."). Whether Robinson should have given more credit to Plaintiff's justifications for her behavior is not for the court to determine. *See Galvan*, 117 F.4th at 939 ("[T]he court is not a super personnel department that second-guesses employers' business judgments." (cleaned up)).

**Ambiguous or Suggestive Comments or Conduct**

Plaintiff cites a single instance wherein Robinson made a sex-related comment at a Risk Manager holiday gathering approximately four months before Plaintiff was terminated. At the gathering, Robinson stated to the group: "I would like to see some more men on the team. Wouldn't you like that, Layne? Shouldn't we give Layne some company?" At the time, one male (Steffen) and eight females reported to Robinson.

Plaintiff contends the comment is direct evidence of discriminatory intent, arguing that it was a "declaration of purpose by the decisionmaker herself." Plaintiff argues that Robinson announced her preference for men and "promptly" acted on it, and a reasonable jury could consider that the Risk Management team had only one male and conclude that Robinson's comment was intended to change the sex balance, which creates an issue of fact for the jury.

OSF disagrees, arguing that Robinson's "party talk at a casual Christmas party outside the office is hardly a 'declaration of purpose.'" OSF argues there is no inference of discrimination from the comment because the remark happened four months prior to Plaintiff's termination and was unrelated to Plaintiff or her termination.

First, Robinson's comment is not "direct" evidence in that it is not a direct admission by Robinson that she fired (or intended to fire) Plaintiff based on any preference for men or a desire to have more men on the Risk Management team. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) ("To raise an inference of discrimination, comments must be (1) made by the decision maker, (2)

around the time of the decision, and (3) in reference to the adverse employment action." (cleaned up)). That said, the comment is still considered as circumstantial evidence. *See Freelain v. Vill. of Oak Park*, 888 F.3d 895, 905 (7th Cir. 2018) (". . . *Teruggi* stated standards for *direct* evidence of unlawful intent. It did not set boundaries for weighing circumstantial evidence as part of a larger case.").

Plaintiff highly oversells the significance of Robinson's comment. Robinson made the comment in an informal setting, to the entire Risk Management team (and not just to Plaintiff), it was not made in reference to any employment action or to Plaintiff, and it demonstrated no animus towards females. Robinson made the comment months before Plaintiff's termination, and the comment preceded both the infant death and cataract surgical incidents. This is a stray comment that does not support an inference of discrimination. *Compare Pratt*, 183 F.4th at 552 (considering workplace culture where suggestive comments "flowed freely," "men in managerial roles regularly made inappropriate comments and jokes to and at the expense of women employees," and the plaintiff "was called a 'bitch' and a 'cunt' for trying to do her job"), *and Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 934 (7th Cir. 2020) (finding the district court had erred in dismissing evidence of sex-role stereotyping as "stray remarks" because the "'stray remarks' rationale can be applied only to remarks that are not part of the decision-making process itself" and the plaintiff's evidence came from the decisionmakers during the decision process), *with Jones v. City of Chicago*, 673 F. Supp. 3d 926, 941-42 (N.D. Ill. 2023) (concluding comments by police sergeant supervisor that it was "not safe" for two female officers to be in a car together and "that's why women don't belong on the job" in reference to the plaintiff

were stray comments and insufficient to establish discriminatory animus and trigger Title VII liability), *and Choy v. Chicago Park Dist.*, 2022 WL 874648, at *8 (N.D. Ill. Mar. 24, 2022) (concluding that evidence of a supervisor asking when an employee was going to retire at least ten times "carr[ied] little weight because they were not directed at [the plaintiff] and had nothing to do with the hiring process").

That Plaintiff's replacement was a male adds little. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) ("That one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition."); *Smith v. Kittle Prop. Grp., Inc.*, 2025 WL 315523, at *3 (N.D. Ind. Jan. 27, 2025) (same). It would be a different story if Hendron was not qualified for the role, but he had 20 years of experience as an assistant for a medical malpractice attorney and extensive prior risk management experience for a large hospital organization. Plus, the leaders of the facility recommended that Robinson hire Hendren.

**Better Treatment of Similarly Situated Employees**

Plaintiff argues that similarly situated male employees were treated better than her, citing uneven discipline between herself and Hill, Steffen's compensatory day, and Steffen's remote work privileges. As already discussed, Hill was a hospital executive with an entirely different set of job responsibilities and reporting structure. As for Steffen, he did not engage in any conduct similar to Plaintiff and there is no evidence that Plaintiff requested and was denied the ability to work from home at

any time. Steffen was, however, offered one compensatory day unprompted by Robinson for working after hours—something that Plaintiff also did, and Plaintiff was never offered compensatory time.

**Pretext**

OSF argues that Plaintiff was terminated because of her conduct in the three primary incidents in this case—the October 2021 deceased patient incident, the infant death incident, and cataract surgical incident—and cites the termination letter describing the same. These reasons are unrelated to Plaintiff's sex.

OSF argues that there is no evidence that Robinson did not honestly believe that Plaintiff engaged in "inappropriate, injudicious, and insubordinate behavior" related to those incidents. OSF also argues that the record shows that Plaintiff admitted to her involvement in those incidents. OSF contends that Plaintiff's disagreement with the decision to terminate her, and her subjective belief that she was terminated because of her sex, are insufficient to establish pretext.

Plaintiff argues that whether OSF's reasons were a pretext is a question for the jury, and references argument made earlier in her brief that, inter alia, OSF failed to follow its own policies, exaggerated its reasons for terminating Plaintiff, disregarded HR advice, and applied inconsistent discipline.[26]

---

[26] To be more specific, Plaintiff argues in those earlier sections that: she was a highly regarded employee, which changed only after she "intensified her whistleblowing[;]" her termination came as a surprise to leadership; OSF supervisors displayed frustration and hostility towards her protected activities; she did not receive progressive discipline; OSF conducted a deficient and perfunctory review of her termination appeal; she was not warned her job was in jeopardy; Robinson solicited feedback to justify Plaintiff's termination; OSF did not conduct a fair investigation before terminating her; Robinson rejected HR's recommendation for lesser corrective action; and Hill authorized Plaintiff's purported misconduct, which

Plaintiff contends that those things, particularly when considered with Robinsons's "stated desire for more men," support an inference of discrimination.

The court recognizes the need to efficiently and effectively organize arguments within a brief and does not fault Plaintiff for simply referencing her earlier arguments. In those earlier arguments, Plaintiff argues that there are material factual disputes over the reason OSF fired Plaintiff, employer motive is a jury question, and there is substantial evidence supporting an inference of pretext. None of her arguments, however (except for an argument about Hill's uneven discipline) have anything to do with sex discrimination. They instead pertain to whether certain protected activities (i.e. whistleblowing and raising patient safety and regulatory issues) caused her termination, whether the proffered reasons for terminating Plaintiff were a pretext for retaliation for those protected activities, and whether the evidence taken together supports an inference of an unlawful motive.

But "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*." *Chatman v. Bd. of Educ. of City of Chicago,* 5 F.4th 738, 747 (7th Cir. 2021) (emphasis added) (citing *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)); *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021). The plaintiff "must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) (citing

she argues "strongly supports an inference that OSF's stated rationale was . . . a pretext for retaliation[;]" post-hoc rulemaking regarding contacting the Legal department; suspicious timing regarding protected activities in the months leading up to her termination; citing previously condoned conduct as terminable offenses; and exaggerated, incomplete, and shifting termination reasons.

*McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009)). The cited evidence and arguments do not implicate sex, consequently offering little support for Plaintiff's sex discrimination claims. *See Igasaki*, 988 F.3d at 961 ("Beyond his poor performance reviews, Igasaki does not offer much, if any, evidence or argument specific to his age discrimination allegations. We reiterate that a speculative inference does not an employment discrimination case make."). To the extent those arguments might have been more explicitly connected to sex, Plaintiff has not developed those arguments, so they are waived. *See Bradley v. Vill. of Univ. Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023).

Altogether, Plaintiff offers scant evidence that her sex played any role in Robinson's decision to terminate her. Robinson made a passing comment about hiring more men at a party months prior to Plaintiff's termination, most of the Risk Management team members were women, and Steffen was offered a single extra compensatory day for working after hours. Plaintiff was required to present evidence on which the jury could reasonably find in her favor, and the "mere existence of a scintilla of evidence" will not do. *See Anderson*, 477 U.S. at 252. A cumulative assessment of all the evidence, with all reasonable inferences drawn in Plaintiff's favor, shows that Plaintiff has not presented evidence by which a reasonable jury could conclude that she was fired because of her sex. Such a finding would depend on speculative inferences, and "a speculative inference does not an employment discrimination case make." *Igasaki*, 988 F.3d at 961. Accordingly, summary judgment must be granted in favor of OSF and against Plaintiff on Counts V and VI.

Supplemental Jurisdiction

Plaintiff's state law claims (Illinois Whistleblower Act, Illinois common law retaliatory discharge, and Illinois Hospital Report Card Act) are all that remain. Where the district court has dismissed all claims over which it has original jurisdiction, it "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3).

Indeed, when all federal claims in a suit are dismissed before trial, there is a "presumption" that the court will relinquish supplemental jurisdiction over the remaining state law claims. *RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). That presumption "should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996).

Certain circumstances justify retaining supplemental jurisdiction, namely: "(1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *RWJ Mgmt.*, 672 F.3d at 480. The first circumstance is not an issue. *See Stephens v. Cnty. of Cook*, 2025 WL 2576765, at *8 (N.D. Ill. Sept. 5, 2025) ("[B]oth federal and state law toll the relevant limitations period when claims are pending in a civil action."). Second, the court has not committed substantial judicial resources to deciding the state claims or this matter in general. Indeed, this is the first and only

significant motion that has been filed in this case, and the court's efforts in granting summary judgment on Counts IV through VI are not sufficiently related to the substance of the state law claims to justify keeping this case in federal court. *See RWJ Mgmt.*, 672 F.3d at 478 ("Here, the judge weighed the relevant factors and decided that the time she had spent on the case, though substantial, was not sufficiently related to the substance of the state-law claims to justify keeping the case in federal court. This was not an abuse of discretion."). Finally, while the summary judgment motion is fully briefed, the court has not determined how the state law claims should be decided, and based on the court's initial review of the briefs, their outcomes are not absolutely clear. *See Stephens*, 2025 WL 2576765, at *8.

Accordingly, the court exercises its discretion to relinquish supplemental jurisdiction over the remaining state law claims, Counts I through III, and DISMISSES those claims without prejudice.[27]

IT IS THEREFORE ORDERED THAT:

(1) Defendant OSF Healthcare System's Motion for Summary Judgment (#65) is GRANTED as described herein.

(2) Judgment is to enter in favor of Defendant OSF Healthcare System and against Plaintiff Lisa Comrie on Counts IV, V, and VI of the Complaint.

---

[27] The court, in its discretion, will not relinquish supplemental jurisdiction over the IHRA sex discrimination claim in Count VI, as that claim is identical to the Title VII sex discrimination claim and is evaluated "under nearly identical standards," *see Rongere*, 99 F.4th at 1102.

(3) The court relinquishes supplemental jurisdiction over the remaining state law claims, Counts I, II, and III, which are hereby DISMISSED without prejudice.

(4) This case is terminated.

ENTERED this 8th day of September 2026.

s/ *Colin S. Bruce*
COLIN S. BRUCE
CHIEF U.S. DISTRICT JUDGE